**THEBES SHIPPING, INC., as Owner and Armco Financial Corporation AG., as Mortgagee of S.T. ARGO MERCHANT, Plaintiffs,**

v.

**ASSICURAZIONI AUSONIA SPA, Defendant.**

**THESSALY SHIPPING, INC. and Spartan Shipping Inc., as Owners of M/V ARGO POLLUX and M/T ARGO TRADER, respectively, and Armco Financial Corporation AG., as Mortgagee of the Vessels, Plaintiffs,**

v.

**ASSICURAZIONI AUSONIA SPA, Defendant.**

Nos. 78 Civ. 1186 (IBW), 78 Civ. 4099 (IBW).

United States District Court, S.D. New York.

Aug. 2, 1984.

Burlingham, Underwood & Lord, New York City, for plaintiffs; Joseph C. Smith, Terry L. Stoltz, New York City, of counsel.

Carro, Spanbock, Fass, Geller, Kaster & Cuiffo, New York City, for defendant; Kenneth A. Lapatine, Mark H. Budoff, Vincent Lipari, New York City, of counsel.

## OPINION

WYATT, District Judge.

This is the decision in these two actions, tried to the Court without a jury. The two actions are by owners and a mortgagee of three ships, to recover on policies of marine insurance for damage to those ships. The first action was commenced on March 16, 1978, the second on August 30, 1978. They were first assigned to Judge Frankel, then on October 25, 1978, they were reassigned to Judge Owen, then on December 17, 1982, they were reassigned to me.

In action 78 Civ. 1186, plaintiffs are Thebes Shipping, Inc. ("Thebes"), a Liberian corporation, and Armco Financial Corporation AG ("Armco"; AG is understood to be an abbreviation for a German word or words meaning "incorporated"), a Swiss corporation. Thebes is the owner and Armco the mortgagee of the ship "Argo Merchant" ("Merchant"). Defendant is Assicurazioni Ausonia SPA ("Ausonia"; SPA is understood to be an abbreviation for Italian words meaning "incorporated"), an Italian insurance corporation, which issued policies insuring the ship Merchant for the period 1300 hours Greenwich Mean Time ("GMT") October 8, 1976 to 1300 hours GMT October 8, 1977.

In action 78 Civ. 4099, plaintiffs are Thessaly Shipping, Inc. ("Thessaly"), a Liberian corporation, Spartan Shipping, Inc. ("Spartan"), also a Liberian corporation, and Armco. Thessaly is the owner and Armco the mortgagee of the ship "Argo Pollux" ("Pollux"). Spartan is the owner and Armco the mortgagee of the ship "Argo Trader" ("Trader"). Defendant is Ausonia which issued policies insuring the ships Pollux and Trader for the period 1300 hours GMT October 8, 1976 to 1300 hours GMT October 8, 1977.

There was a joint trial of the two actions in accordance with a pretrial order filed March 8, 1983 (PTO 2; PTO references are to paragraphs of that pretrial order), to which the parties consented. (The pretrial order recites that the parties "agreed that the trial of these actions shall be joint and consolidated", but the actions have not been consolidated. Fed.R.Civ.P. 42(a)).

Each of the two actions is within the admiralty and maritime jurisdiction of this Court. 28 U.S.C. § 1333.

It is not disputed by defendant (Post-Trial Memorandum of Law, p. 2) that, if the policies of insurance on which these actions were brought are valid obligations of Ausonia, the evidence would lead to judgments against Ausonia in favor of plaintiffs.

The trial was concerned with issues related to certain affirmative defenses raised first by defendant Ausonia in its answer filed in action 78 Civ. 1186. The pleadings, however, have little value in defining these issues and no answer appears to have been filed in action 78 Civ. 4099. But by the pre-trial order (PTO 1) the pleadings were agreed to be deemed amended in accordance with the framing of the issues in paragraph 10 of that order. The trial was almost entirely concerned with issues formulated by defendant Ausonia in the pretrial order (PTO 10(b)). In summary, defendant Ausonia asserts these defenses:

(a) that the insureds and their representatives failed to disclose to Ausonia facts material to the risk;

(b) that a representative of the insureds misrepresented to Ausonia the true loss figures for the year October 8, 1975—October 8, 1976, of the insurers of the Fleet of which the ships Merchant, Pollux and Trader were a part;

(c) that a representative of the insureds fraudulently represented to Ausonia that the loss figures for the Fleet, excluding Argo Leader, for the year October 8, 1975—October 8, 1976, showed a 72.27% credit balance in favor of the insurers when, in fact, the true loss figures showed a substantial debit balance against the insurers; and

(d) that the insureds failed to pay the insurance premiums as they became due.

The evidence abundantly establishes the defenses summarized in (a), (b), and (c) above and, as a matter of law, the conclusion follows that the insurer Ausonia is justly entitled to avoid the insurance contracts. Thus, it is not necessary to reach and decide the many fact and law contentions made for and against the defense summarized in (d) above.

Judgment in each action must be in favor of defendant Ausonia.

1.

The three ships, for damage to which these actions are brought, were at all material times part of the Amership Fleet ("the Fleet"). The other ships in the Fleet were Stolt Argo, Argo Castor, Argo Leader, and Stolt Argobay. Argo Leader was sold on August 11, 1976. Coral Arcadia became a ship of the Fleet at the beginning of the 76/77 year. The insurable year for the Fleet begins on October 8. The "76/77 year" refers to the insurable year beginning October 8, 1976; this form of reference will sometimes be used hereafter.

The Fleet was "operated" (by which is understood managed) from an office in New York by Amership Agency, Inc. ("Amership"), a New York corporation (PTO 3(iv)).

It may be safely assumed, and appears to be taken for granted by all concerned, that the ships in the Fleet were owned by Greek interests; as Skarvelis, President of Amership, testified (by deposition, Ex. HV,

p. 7) Amership "represented owners that were managed and operated by Triship Agency in Greece".

### 2.

The language used in the London insurance business, to judge by the examples in evidence here, is often puzzling to outsiders. It may throw some light on the meaning of the documents if notice is first taken of underwriting customs and practices in London. These are well described in *Edinburgh Assurance Co. v. R.L. Burns Corp.*, 479 F.Supp. 138, 144–146 (C.D.Cal.1979), *affirmed except as to interest,* 669 F.2d 1259 (9th Cir.1982).

In the marine insurance industry in London, Lloyd's and the Institute of London Underwriters ("ILU") have the highest reputation and prestige. ILU is a membership group of insurance companies. The "fringe market" is made up of those insurance companies that are not members of ILU. The "continental market" is made up of insurance companies on the European continent, some of which have offices in London. The "overseas market" is made up of underwriters, principally insurance companies, outside England and Scotland.

Lloyd's is in substance a membership corporation, its members being individual underwriters. Lloyd's does not itself sell insurance but provides a building with appropriate facilities where its member underwriters sell insurance. Lloyd's has a policy preparation office which prepares policies for its members reflecting the terms of insurance sold. Lloyd's has an office for passing on claims made under policies issued by its members. Lloyd's also has a group which passes upon approval of brokers to deal at Lloyd's, for only an approved broker may place insurance with underwriter members of Lloyd's. The administration of Lloyd's is by its elected Committee.

The members of Lloyd's are organized into syndicates of from a few to several hundred members resident in England and all over the world (called "names" in the syndicate). The syndicates are the entities which sell insurance on the floor at Lloyd's

from a desk or "box" where a representative negotiates and decides on proposed insurance risks brought by brokers to the syndicate. If agreement on terms is reached, the representative subscribes on behalf of the syndicate to cover with insurance the risk or (generally) a percentage part of the risk.

An insurance broker is an agent for the insured (in marine insurance, the shipowner). The representative of the underwriter is usually called an "underwriter's agent" or sometimes "underwriter's broker".

The placement of insurance at Lloyd's was explained in the *Edinburgh Assurance* opinion as follows (479 F.Supp. at 145–46):

> The underwriter agent, or underwriter, sits in his box on the floor waiting for brokers to approach him with possible insurance risks. The broker provides for the underwriter's consideration a document known as a broker's slip, which contains the details of the risk which the broker is trying to insure. The broker negotiates with the underwriter to obtain the latter's agreement to both the insurance terms and the rate of premium. The underwriter who structures the transaction with the broker and settles on terms becomes known as the lead underwriter. The lead underwriter's syndicate is called the market lead or leader of the market for that particular risk. The lead underwriter then subscribes his syndicate to a particular percentage of the risk, for example, five percent. The underwriter places his initials on the broker's slip together with the particular percentage to which he is subscribing . . . .

> The broker, having obtained the agreement of one underwriter to terms and premium, as well as a subscription to a percentage of the risk, retains the slip and approaches other syndicates or insurance companies both on the floor at Lloyd's and in the outside offices of insurance companies. The broker presents the slip to them for them to consider whether they desire to subscribe to the

agreement as constituted between the broker and the lead underwriter. Each subsequent underwriter may express no interest, may agree to the terms on the same premium rate, require a higher premium rate, or require different terms. In the last two cases, underwriters who had already subscribed would be informed of new terms and their obligations normally amended to conform. In any event, the underwriter who agrees to subscribe his syndicate places his syndicate initials and the percentage of risk he desires to cover on the slip, and the broker moves on to other underwriters. In this manner the broker moves around the insurance market, both at Lloyd's and among the insurance companies, until he has obtained underwriters' commitments subscribing to one hundred percent of the risk on the slip. At that stage, the broker can confirm to the applicant for insurance or his contact with the applicant that the risk is fully subscribed, or "completed."

Once the broker has succeeded in completing the slip, that is, has obtained one hundred percent coverage, he retains the slip and returns it to his office. Participating underwriters on the risk receive a copy of that part of the slip containing terms and conditions for their files.

When the insurance has been fully placed, the broker prepares a "cover note" which summarizes the terms of the insurance as placed. The broker sends the cover note to the insured.

The broker then prepares a paper called "closing instructions" which is sent to the insurer (or its agent) as a guide for the preparation of the policies of insurance.

The final step is for the insurer, or often the broker, to prepare the insurance contracts, the policies of insurance, and after execution to deliver them to the insured, generally through the insured's broker.

If, during the term of the insurance, a claim arises under a policy, the broker for the insured usually acts to help with the preparation of the claim and its processing. An important step in the claims procedure is the "survey"—an examination of the damage by experts to determine its cause, its extent, and what repairs are necessary. In this connection, the Salvage Association ("SA") frequently appears and this institution should be noted.

The SA is a non-profit organization with headquarters in London and offices all over the world. Its purpose is to make damage surveys of merchange ships in connection with claims against underwriters; SA acts largely on behalf of underwriters in the London market. A damage survey of a marine casualty is normally made by SA acting for the insurers and a surveyor acting for the shipowner.

The expert witness for defendant (Dyos), whose testimony was impressive and is accepted, testified that over a long period of time the Joint Hull Committee in London, composed of representatives of Lloyd's and of ILU, had indicated that in considering an insurance risk there is a standard for the loss statistics to be disclosed. "This standard is they require the loss record on the current year plus the three previous years" (T 365; "T" references are to pages of the stenographic transcript of the trial). The witness did not cite anything in writing from the Joint Hull Committee but said the standard is "very well known in the trade" (T 366). There is no contradictory testimony or at least none is remembered or found in the record.

### 3.

Marine insurance on all the ships in the Fleet was placed by Amership at one time and for one-year periods. The total insurance desired was divided among a number of underwriters (the terms "underwriters" and "insurers" are synonymous and are used interchangeably), each taking a percentage of the risk. Each ship was separately insured and each insurer issued a separate policy on each ship for the percentage of risk accepted.

Beginning with the insurable year October 8, 1972—October 8, 1973 Amership acted in ship insurance matters through Thomas E. Leeds Company, Inc. ("Leeds"),

a New York corporation, an insurance broker and adjuster in New York City. Thomas E. Leeds was the head of Leeds; he will be referred to sometimes as "Leeds" but the context will indicate whether the reference is to Mr. Leeds personally or to the organization.

Leeds had asked for insurance placing business from Amership "if we could come in better than our competition"; Amership gave Leeds a chance to obtain a favorable premium rate; Leeds put this in the hands of Robert Bradford Hobbs Savill ("Bradford"), a Lloyd's insurance broker in London; Bradford was able to place the Fleet insurance at a favorable rate; and thus Leeds got the first insurance order from Amership. (Ex. IB, pp. 5–7)

Leeds placed marine insurance for the Fleet through London brokers because they "seem to have a greater feel for the worldwide market", because if you "have a Lloyd's lead, it's not very difficult for a London broker to get it followed by throughout the world", and because lower premium rates resulted. (Ex. IB, p. 4)

4.

The loss record of the Fleet after October 8, 1972 was very bad in that paid claims and outstanding claims against the insurers far exceeded the premiums.

Leeds went to London in August 1975, principally to talk to Bradford in anticipation of a difficult renewal of the Fleet insurance for the year to commence on October 8, 1975. Bradford did not give Leeds the time he felt necessary to go over the matter in the face of the loss record but on Thursday, August 28, 1975, told him that they were finding time to see the lead underwriter at Lloyd's. The next day Leeds talked to Bradford again, when they told him they could not "hold out much hope", that a "vast rise" in premium rates appeared likely because of the "loss record" which was "quite high", and, as Leeds was going to Greece, they would send a cable there giving him more information about the renewal. (Ex. IB, pp. 8–10)

Leeds went to Athens on Saturday, August 30, and to the Athens Hilton Hotel. There he received a telex (Ex. Q) from Bradford in the early part of the week beginning September 1, 1975. Bradford reported the very hard terms demanded by insurers for renewal and that Bradford felt "horrified" at having to send "the worst message". Bradford reminded Leeds of the "pretty horrible" underwriting results of the Fleet and gave the following figures for 1973–75: premiums paid, $1,132,796; claims paid $1,790,460; claims outstanding approximately $900,000. This indicated a loss to the insurers in two years of $1,557,-664. Bradford believed "some savings can be made" on the renewal terms demanded, but not much.

Leeds telephoned Bradford from Athens, saying that the conditions for renewal were "ridiculous" and that Bradford was not doing a good job (Ex. IB, p. 10). Leeds then had the idea that Crowe, Dalton and Lambert ("CDL"), another Lloyd's broker in London, might be able to place the Fleet insurance better than Bradford. CDL had a branch office in Athens, to which Leeds telephoned and found that Don Lambert himself was shortly arriving in Athens.

Leeds then saw Lambert at the hotel in Athens in early September, 1975. He had known Lambert for many years. He showed Lambert the telex from Bradford and went over the renewal difficulties, that the renewal terms from Bradford were a 50% increase in premiums and an increase in deductibles "[b]ecause of the loss record of the fleet" (T 91–92). He offered Lambert the placement of the Fleet renewal to begin October 8, 1975. Lambert believed he could do it but said that, because of the losses, there would have to be a premium increase. Lambert also proposed that the renewal be attempted by trying a different market than they had with Bradford—that they go "outside the Lloyd's market" (T 89), meaning, as the events showed, the overseas market primarily. Leeds asked him to see if the premium increase on renewal could be held to 10%. From that time forward CDL was the placing broker

for the Fleet and Bradford was asked to stop its efforts.

The evidence as to the beginning of the placing of insurance for the Fleet through CDL strongly suggests a planned strategy by CDL to obtain renewal of the insurance by seeking out new insurers in the market outside England and diverting their attention from the losses suffered by the Fleet in the past. In view of subsequent events which caused the cases at bar to be brought, some of the deposition testimony by Lambert is most revealing. When asked what he said to Leeds in Athens, Lambert gave this answer (Ex. HZ, p. 15):

> Well, I looked at the placing. Knowing it was 100% in the Lloyd's and ILU market, it meant that all the outside markets had not suffered any losses, were not involved with the fleet, and therefore were open to negotiation; and I suggested that if he wanted the maximum cover available the only way we could do this would be to obtain a small lead in the London market and to place the business around the world.

After the Leeds-Lambert discussion in Athens, Leeds returned to New York and Lambert remained a few days in Athens. They spoke on the telephone. Lambert was asked what Leeds told him by telephone. Lambert was asked what Leeds told him by telephone "about the casualty rate" (Ex. HZ, p. 17). Lambert gave this answer:

> Nothing specific, because it didn't really bother me too much, the casualty position, because I wasn't placing it in the same market that it had been in before. In other words, I was approaching underwriters who had not had any casualties. Therefore, it became a completely new risk to that market.

The object of Lambert seems evident: to place the Fleet insurance with underwriters who had not done business with the Fleet before and did not know its loss record. This is consistent with Lambert's practice not to describe the loss record to the underwriters he "contacted" (T 105) and not voluntarily to disclose the loss record of a fleet to prospective insurers (T 106, 108).

After the Leeds-Lambert telephone conversations, Leeds sent to Lambert by telex on September 15, 1975, the details of the bad loss record of the Fleet from October 8, 1972 through August 12, 1975, as follows (Ex. C):

| Year | Net Premiums | Claims Paid | Claims Outstanding |
|---|---|---|---|
| 10/8/72–10/8/73 | $ 527,000 | $ 754,659 | $ 517,500 |
| 10/8/73–10/8/74 | $ 491,369 | $ 959,129 | $ 595,000 |
| 10/8/74–8/12/75 | $ 654,129 | $ 840,000 | $ 975,000 |
| | $1,672,498 | $2,553,788 | $2,087,500 |

These figures show a substantial excess over premiums of claims paid and outstanding in each of the three consecutive years. The total amount of this excess was $2,968,790, an indicated loss to the insurers of that amount or, as often expressed in the insurance business, a debit balance of 178%.

5.

Lambert believed, after consulting with other brokers, that with a premium increase the renewal insurance might be obtained in the overseas market. The premium increase was submitted to Leeds in New York, approved by him and Amership, and the campaign began. The exact amount of increase has not been found in the record, but is believed to have been 10%; Leeds had asked Lambert to try not to exceed this figure.

CDL, as a first step in the effort, obtained as lead underwriter at Lloyd's H.L. Quartermaine ("HLQ"), described by Lambert as "a recognized Lloyd's leader" but "not necessarily on Greek-American ships" (Ex. HZ, p. 30). HLQ agreed to take .25% or ¼ of 1% of the risk. This is a very small percentage of the risk for a lead underwriter to take (5–7½% is normally taken by the lead; T 600) and indicates that HLQ did not have a very favorable opinion of the risk. The well-informed expert witness for defendant (Dyos) testified that a lead Lloyd's underwriter would normally take at least 5% of the risk (T 462). It was unusual, to say the least, for CDL to select as a lead a Lloyd's insurer who was willing to take no more than ¼ of 1% of the risk and unusual

for a Lloyd's insurer to consent to be the lead underwriter with so small a risk. So questionable was the practice that a member of the Committee of Lloyd's later told Lambert, among other things, that they objected to the practice, that "they were after stamping it out", and not to do it (Ex. HZ, pp. 28–30; the incident which brought on this censure was the use of a lead Lloyd's insurer who took ½ of 1% of the risk or twice the risk taken by HLQ in 1975). Lambert must himself have recognized that the practice was wrong because he testified that he stopped using the practice three weeks after the Amership placement of October 8, 1976 (T 162).

It can only be concluded that CDL arranged for a lead underwriter at Lloyd's, who accepted only ¼ of 1% of the risk, in order to secure the prestige of Lloyd's in selling the renewal risk in the overseas market. To enjoy this advantage, however, it was necessary that the prospective insurers of the Fleet should not learn the small percentage of risk taken by the lead insurer at Lloyd's (indeed, only one underwriter at Lloyd's other than HLQ took any of the risk and that for 2%, for a total placement at Lloyd's of only 2¼% (T 156; Ex. F)). This is because, as the expert witness testified, if the prospects learned that the broker cannot place more than a small percentage at Lloyd's, "they must think there is something wrong with the risk" (T 477).

6.

During the renewal effort for the 75/76 insurable year, part of the risk was accepted by Stewart Wrightson, an underwriters' agent in London, through whom the Amership Fleet came to the notice of Roland Pardo, an underwriters agent, principally in Milan and from time to time in London. Pardo will figure significantly in the later events here in suit, and some of his earlier activities should at this point be explained.

The Pardo family had at all relevant times a family insurance business in Milan called Adolphe Pardo Associates ("APA"), an Italian corporation (Ex. 51, p. 3), acting primarily as an agent for Continental underwriters, including defendant Ausonia.

Roland Pardo was important in the business, as was his older brother David. APA had no offices outside of Milan, but Roland Pardo was from time to time in London and when there sometimes used the offices of London & Continental, a company connected with the Pardo family. Neither APA nor Ausonia had offices in London (T 608).

In early October 1975, Cantouris, a senior marine broker at Wrightson, telephoned Roland Pardo in Milan offering him reinsurance business (T 576). Pardo asked for the proposal in writing and Cantouris, on October 6, 1975, sent Pardo in Milan a telex message with an Amership reinsurance proposal (Ex. HA, p. A). Pardo had some questions about the proposal and replied to Cantouris by a telex on the same day putting these questions to him (Ex. HA, p. B). One of these questions was whether "five years statistics" could be supplied. Cantouris replied to this question by telex on the same day that only three-year figures were available "which show premium dlrs 1,600,000 against claims dlrs 2,500,000 (of which dlrs 1,000,000 casualties)" (Ex. HA, p. C). It is not surprising that Pardo found this answer hard to understand, because claims represent insured damage caused by accidents to ships; Cantouris, however, was reporting that there were "claims" of $2,500,000 but only $1,000,000 of "casualties". Pardo testified at trial that he spoke to Cantouris by telephone and "asked him if he could clarify the statistical exhibit he was indicating in his telex message to me because it was ambiguous" (T 579), and that Cantouris "indicated that he was not very clear himself as to what those figures meant, but assured me that the fleet was showing a profit" (T 588). This testimony of Pardo (as with his other testimony) is accepted by the Court as credible; moreover, it is in no way contradicted in the record.

The plaintiffs contend (Main Brief, pp. 30–31) that Pardo was advised by Wrightson, before the 75/76 year, that for the three prior years Amership Fleet suffered casualties of approximately $2,500,000 against premiums of $1,600,000. It is

found that Pardo was not so advised by Wrightson; that Wrightson advised Pardo that for the three years prior to the October 8, 1975—October 8, 1976 insurable year the Amership Fleet against $1,600,000 in premiums had claims of $2,500,000 of which $1,000,000 were casualties (meaning damage covered by insurance); and that Wrightson, through Cantouris, assured Roland Pardo that Amership Fleet was showing a profit to its insurers.

### 7.

In September and early October 1975, CDL worked to place the renewal insurance on the Fleet and was finally able to do so. It was a hard task, however, because of the losses to Fleet underwriters in the past. It was not until October 7, 1975 that it was completed; this was only hours before expiration of the then existing policies. CDL advised Leeds of the completion on October 7, 1975 by telex (Exs. F, G). The difficulty of the placement can be seen by Lambert's expressive description in the telex: "hell, it was close". It is further evidenced by Lambert's comment to Leeds in the same telex in giving the list of renewal underwriters: "hope there are not too many objections as feel it highly unlikely that we shall be able to replace any lines."

### 8.

Doubtless the underwriters who accepted the Fleet risk for the year to commence October 8, 1975, regretted that they had ever done so. The risk turned out to bring substantial losses. This was the 75/76 insurable year, just before the insurable year for which Ausonia issued its policies to plaintiffs. The claims which arose from Fleet damage in that prior year must therefore be examined in some detail.

### 8a.

#### Argo Castor

Argo Castor, a ship of the Fleet, sustained severe damage from very heavy weather encountered May 3–6, 1976 on a voyage from Australia to Holland. The voyage was completed. The ship then went for repairs to Palermo, Sicily, where she arrived on June 5, 1976.

On June 6, 1976, Leeds notified CDL by telex referring to "our claim 1719" (the number assigned by Leeds to heavy weather damage to Castor, see Ex. EN for example) that Castor was at Palermo having reported engine damage, asked CDL to advise underwriters and to arrange for Salvage Association survey attendance, and informed CDL that a survey had also been arranged of March 1975 ice damage to Castor in the prior policy year (Ex. EL).

On June 7, 1976, Castor entered drydock at Palermo and repairs commenced. Repairs for the ice damage and the heavy weather damage were done at the same time. The Salvage Association was instructed on June 7, 1976 to survey for underwriters as to ice damage and on June 8, 1976 to survey as to heavy weather damage.

Stamatiadi, a surveyor from Amership in New York, was at the drydock June 5-November 1, 1976 (Ex. FN, p. 168). Counsel for plaintiffs agreed that the owners knew exactly what repairs were being made (T 401). Beginning June 5, 1976, Stamatiadi reported to Amership about the repairs to Castor "giving them weekly or ten days reports on the status of repairs" (Ex. IC, p. 46).

The expert witness (Dyos) testified, from examining all relevant documents in evidence, that it could be determined what damage to Castor was from ice in March 1975 and what from heavy weather in May 1976 (T 402–04).

In the summer of 1976 the owner of Castor was arranging to borrow money from Bank of America in New York and was preparing to assign to that Bank all claims against underwriters for "ice damage" (called "claim 1653") and "heavy weather" damage (called "claim 1719"). (Ex. EN) There was a "commitment letter" from Bank of America, dated June 29, 1976 (Ex. EO), by the terms of which the Bank was entitled to "full documents to collect the claims". On August 31, 1976, Leeds wrote to Bank of America represent-

ing that the ice and heavy weather claims on Castor "based on the information to date, will be in excess of $1,500,000" (Ex. EN).

The insurers were responsible for claims for damages to Castor, whether caused by ice or by heavy weather. Both were insurable events. The ice damage was payable by the insurers in the 74/75 year, the heavy weather damage was payable by the insurers in the 75/76 year. Both were part of the loss record of the Fleet. (T 406-07).

On September 17, 1976, Leeds wrote to Bank of America (copy to Amership) about "ice damage" and "heavy weather" damage to Castor and making representations to the Bank about the insurance claims for that damage. Among the representations was: "Ice damage and Heavy weather are perils covered against under the applicable policies of Hull & Machinery, etc." (Ex. ES).

On September 10 and 17, 1976, Leeds and counsel arranged in New York for the owner of Castor to execute payment orders directing the underwriters for the 74/75 year to pay to Bradford the amount due under the policies in respect of "ice damage—March 1975" and directing the underwriters for the 75/76 year to pay to CDL the amount due under the policies in respect of "heavy weather—May 3/6, 1976" (Ex. EU: Exs. EP, EQ, ER).

The repairs to Castor at Palermo were completed on September 30, 1976 (Ex. FG, p. 38). While the exact amount of the insurance claim may not have been known at that time, the approximate amount was certainly then known and known to be a large amount; on August 31, it had been estimated by Leeds as in excess of $1,500,-000.

The expert witness (Dyos) testified (T 418) that, from his study of the files, "well before the October 1976 date [October 4, 1976 in the question] the owners or Amership and certainly Thomas E. Leeds must have known that there was a substantial claim for heavy weather damage".

It turned out that the insurance claim for heavy weather damage in May 1976 was $1,278,496.36 (Ex. FN, p. 177) and for ice damage in March 1975 $1,204,368 (Ex. FN, p. 3 of "Request for Payment on Account, etc."; T 430).

### 8b.

### Stolt Argobay

On June 24, 1976, the Fleet ship Stolt Argobay was on a voyage from Buffalo to Toronto. That day, it passed through the Welland Canal and, according to the ship's log, in lock 3 had three or more collisions with the lock walls (Ex. 58, p. 3).

The President of Amership testified (by deposition) that if a ship sustains damage, the master has a duty to notify the owner or the owner's representative; "the master has custody of the vessel and must inform the owners through their representative ... of anything affecting them" (Ex. HV, p. 73).

According to the custom and practice in the shipping industry, the master is "to take the first opportunity to report [to the shipowner] damage to the ship" (T 439). True to this custom, the master of the Argobay reported the damage to the owner (whether directly or through Amership is not clear from the record) in two letters, one dated June 25, 1976, and the other July 19, 1976 (Exs. FP, FQ).

The letter of June 25 must have been mailed in Toronto to the owner in care of Amership in New York and received in a few days. This letter reports the collision with the walls of lock 3, on both starboard and port sides and both forward and aft, that three tanks (1, 3, 12) were indented on the starboard side, and that he could not see how many were indented on the other side because this was covered by the berthing. Three tanks were inspected on the inside and apparently many frames were damaged.

The letter of July 19, from wherever sent by airmail, received in a week, more or less, adds more details of the damage. The master found that the port outside was dented also and that a total of nine tanks

had outside indentations and that there were, inside, many bent and some cut frames; the same damage also appeared in the pumproom, cofferdam, and deeptank.

The letters in June and July, 1976, from the master, on their face, showed to the owner and Amership and Leeds an insured claim which was substantial. The expert (Dyos) testified that the claim "was of some size" because not merely were outside hull plates damaged, but inside the tanks the frames were bent (T 557).

The repairs to the Argobay made necessary by the lock collision on June 24, 1976 were made at Miyushima, Japan, where the vessel arrived on February 14, 1977.

The representative of the owner of Argobay alleged at the survey that the damage had been caused "as a result of contact with piers/locks" but, the log books being then unavailable, the place and date could not be alleged; the surveyors were of the opinion that "the damage found could be reasonably attributed to a casualty of the nature of that put forward" (Ex. 58, p. 8).

The repairs were completed on February 27, 1977.

There was a payment on account on May 27, 1977 of $220,000.

The total claim as agreed by underwriters was $359,047.93 which, with the $20,000 deductible in the policies, left a payable claim of $339,047.93 (Ex. 58, p. 38).

### 8c.

### Argo Leader

This vessel, as already noted, was sold on August 11, 1976. Between October 8, 1975 (the beginning of the 75/76 year) and August 11, 1976, however, substantial claims had arisen for damage to Leader.

The amount of these claims can be determined from the figures used by CDL and which are in evidence.

On October 8, 1976, CDL sent a telex to a prospective underwriter on the Fleet renewal, INA in Brussels, in which the loss records in dollars for the year 75/76 purported to be given (Ex. CR, Ex. 48, pp. 36–37), both including Argo Leader and

Coral Arcadia and excluding Argo Leader and Coral Arcadia. Since no insurance was placed on Coral Arcadia for the year 75/76, no loss figures on that ship would appear in the Fleet figures nor would they be relevant in the case at bar. According to the CDL telex, (Ex. CR), claims paid for the 75/76 year, including Argo Leader, were $472,434 and, excluding Leader, there were no claims paid. According to the CDL telex, claims outstanding for the 75/76 year, including Leader, were $435,000 and, excluding Leader, were $175,000. Thus, for the 75/76 year Leader was responsible for $472,434 in claims paid and $260,000 in claims outstanding, or a total in claims for the 75/76 year of $732,434.

### 8d.

### Argo Trader

The amount of this claim can be determined from the evidence by a reconstruction process; the evidence itself does not contain a specific figure.

This ship was at Piraeus in Greece between May 7 and June 7, 1976. During the stay at Piraeus, the engine room crew carried out maintenance work on the boilers which involved opening the boilers, as well as the auxiliary condenser, for inspection and cleaning (Ex. 74, p. 2). The ship then sailed for Sarroch in Sardinia. While underway on June 8, the boilers began to leak from all "tube nests". The ship was diverted to Palermo in Sicily for survey and repairs; arrival in Palermo was on June 9. It was there found that at Piraeus the crew had "negligently failed to put packing on certain of the auxiliary condenser tubes" and that this caused "extensive damage to the port and starboard boiler tubes" (Ex. 74, p. 2). Repairs commenced on June 11 and on June 16 were completed to the starboard boiler. On June 16 the vessel sailed for Sarroch, with repairs to the port boiler continuing. After loading cargo at Sarroch, Trader returned to Palermo where she arrived on June 22. Repairs to the port boiler were completed on June 24 (Ex. 74, p. 2).

The evidence shows that the amount of the claim at that point, known to Leeds and to the owner and Amership, was $180,-527.71 but that the "final claim on Underwriters" would be more than that for "port charges, agency fees" and the like (Ex. 74, p. 4). There was a payment on account of $135,000 (Ex. 74, p. 4).

The evidence on which the above summary is based is the "Request for Payment on Account" prepared by Leeds (Ex. 74), dated August 23, 1976.

Stewart Wrightson, as already described, had accepted for Aeolis part of the risk on the Fleet for the 75/76 year. In connection with final settlement of the claim for the June 8, 1976 damage to Argo Trader, Wrightson sent a telex which among other things stated that the balance due on an 8.6% underwriting of the damage to Argo Trader was $4,925.52 (Ex. GO). If this amount is 8.6% of the balance, then the entire balance due from insurers (100%) is $57,273.48. This sum added to the part payment of $135,000 establishes that the claim for boiler damage on Argo Trader on June 8, 1976 was $192,273.48. (Defendant states this amount as $192,273.38, a difference of 10 cents. (Post-Trial Brief, p. 13)).

### 8e.

### Stolt Argo

On a voyage with cargo from Louisiana to Guyana via Jamaica, this ship of the Fleet sustained damage to its stern tube which was fouled by fishing nets on February 26 and 27, 1976. The voyage was completed and the ship returned to Louisiana where on March 31, 1976, she anchored at a shipyard in New Orleans for repairs, which were completed on April 14 (Ex. EH, pp. 4, 15–17). During the time of repairs, Stamatiadi, representing Amership and the owner, was at the ship as surveyor, and a surveyor for underwriters from the Salvage Association was also present.

The invoiced cost of the repairs to Argo, as approved by the surveyor for underwriters, was $80,512 (Exs. DK, DL, DM). This cost was reflected in invoices to the owner in care of Amership. Leeds asked the Salvage Association on May 10, 1976 for approval of the three invoices (Exs. DK, DL, DM) on the claim that "damages were occasioned by the propeller being fouled by fishing nets" (Ex. DP).

It appears that, while the Salvage Association approved in June 1976 the cost of the repairs ($80,512), it did not agree that the damage was caused entirely by the fouling of the fishing nets in February 1976. The Salvage Association believed that a good part of the damage was caused by negligence in making repairs at Curacao some years before (Ex. DU; also Exs. DQ, DT).

The dispute between the owner of Argo, Amership, and Leeds on the one side, and the Salvage Association for underwriters on the other, was not resolved during the insurable year 75/76. The claim was for $80,512; the Salvage Association had approved $12,945 as damage caused by the February 26 and 27, 1976 fouling by fishing nets (Ex. DQ); there was a payment on account of $10,000 (Ex. EH, p. 57) on this claim.

The dispute was not settled until March 31, 1979, when the Statement of Particular Average was signed by Leeds (Ex. EH, p. 57). This recognized that, after the usual $20,000 deductible and another deductible of $2,870.82, the 75/76 year underwriters should pay $639.82 on the Argo fishing net claim (Ex. EH, p. 57). This with the $10,-000 payment on account represents a payment on the Argo February 1976 fishing net claim of $10,639.82. The balance of the claim as made was attributed to negligent repairs to Argo in drydock at Curacao in November 1972 and allocated to underwriters at the appropriate times (Ex. EH, pp. 21, 57).

### 8f.

### Summary

The lengthy explanation of the claims made against the underwriters for the 75/76 year has been necessary to establish what the true loss record of the Fleet was in that year, in order to measure this against the figures which, it will later be

seen, were shown to Pardo, as defendant's representative.

In summary, the following are claims made against the underwriters for the insurable year October 8, 1975 to October 8, 1976, in dollar amounts in round numbers as ultimately adjusted:

| | |
|---|---:|
| Argo Castor | $1,278,000 |
| Stolt Argobay | 339,000 |
| Argo Leader | 732,000 |
| Argo Trader | 192,000 |
| Stolt Argo | 10,000 |
| | $2,551,000 |

It is recognized that in some instances the amount payable as here shown was not agreed upon ("adjusted") until *after* the end of the insurable year 75/76. But the damage to the ship in every case occurred before October 7, 1976 and was known to the owner and to Amership and to Leeds before October 7, 1976. It was similarly known before October 7, 1976 that a claim would be made against the insurers; the amount of that claim could be estimated with a fair degree of accuracy before October 7, 1976—for example, Leeds had no difficulty in estimating on August 31, 1976, that specified claims on Castor would exceed $1,500,000 (Ex. EN).

The evidence thus shows that before October 7, 1976, the owners and Amership and Leeds knew or could estimate that for the insurable year 75/76 (including Leader to the date of sale) the claims paid and outstanding on the Fleet were about $2,551,000 against premiums of $656,000 (in round figures; Ex. CR), or a net loss to the insurers of about $1,895,000, a debit balance of about 288%.

As a part of the analysis of Argo Castor made in section 8a above, it has been seen that there was a claim for the insurable year 1974–75 for ice damage in March 1975 in the amount (in round numbers) of $1,204,000. This loss had not been included in the figures sent by Leeds on September 15, 1975 to CDL (Ex. C). Revised to include the Argo Castor claim for ice damage in March 1975, the loss record of the Fleet from 10/8/74 through 8/12/75 is: Net Pre-

miums $654,129; Claims Paid $840,000; Claims Outstanding $2,179,000. The revised loss record for the Fleet for the three years 10/8/72—8/12/75 is: Net Premiums $1,672,498; Claims Paid $2,553,788; Claims Outstanding $3,291,500. These figures show that for the three-year period 10/8/72 through 8/12/75 there was an excess over premiums of claims paid and outstanding of $4,172,790, an indicated loss to the insurers of that amount, a debit balance of about 250%.

The loss record of the Fleet, as shown by the evidence, can now be stated for the four-year period 10/8/72—10/8/76 (including Leader to the date of sale): Net Premiums $2,328,498; Claims Paid and Outstanding $8,396,288. The result is a total net loss to insurers of $6,067,790 and a debit balance for the four years of approximately 260%.

9.

About the end of August, 1976, Leeds and CDL began their effort to place a renewal of the Fleet insurance for the insurable year 76/77 which would begin October 8, 1976.

Apparently one of the first things done was for CDL to get HLQ to sign a placing slip accepting part of the risk. That slip (Ex. 1) is not clearly dated, is signed only by HLQ, and accepts 0.125% of the risk, ⅛ of 1%, a very small percentage and half the already miniscule percentage taken by HLQ the year before. The only conclusion from the evidence is that CDL signed HLQ as "lead" underwriter only for the inducement value to less sophisticated insurers of having a Lloyd's underwriter as "lead". This seems to have been used as a selling point in offering the renewal in the market. A telex offer of the renewal, for example, states "Leader Lloyd's Underwriters" (Ex. CR); it is not stated that the "leader" accepted only ⅛ of 1% of the risk and was the only Lloyd's underwriter to accept any part of it. As Lambert testified (T 42): "Many overseas underwriters are happier when they follow a Lloyd's underwriter". Although the conduct here seems dubious on its face and was later in principle cen-

sured by Lloyd's, CDL must have felt that the difficulty of the renewal forced them to it. So far as appears, Lambert himself did not have the dealings with HLQ. He testified that Rodford of CDL "would go there" (T 128). Rodford did not testify at the trial and no deposition by him is in evidence. Lambert testified that he "would imagine" that Rodford reported back to him of Rodford's activities with HLQ but "cannot recollect" whether Rodford reported the halving by HLQ of its percentage of risk (T 128). Lambert and all others dealing with the matter at CDL are believed to have known at once of the HLQ halving of its risk and that this was caused by the continued poor loss record of the Fleet.

As already explained, custom and practice is that after the lead underwriter has signed the broker's slip, the broker retains the slip and presents the *same* slip to other insurers for them to consider. Those who accept the risk sign *that slip* and the broker moves about the insurance market "until he has obtained underwriters' commitments subscribing to one hundred percent of the risk on the slip" (479 F.Supp. at 145).

The usual custom and practice, it may be inferred, could not be followed by CDL to advantage in the case at bar because if prospective subscribers saw that the "lead" underwriter had taken only ⅛ of 1% of the risk, they would be frightened away from the commitment. This seems to explain why the slip signed by HLQ (Ex. 1) has no other signatures on it and why, so far as the evidence discloses and contrary to custom and practice, it was shown to no other prospective underwriter.

### 10.

Anthony Mannion was an employee of CDL beginning in December 1975 and was working at CDL during the 1976 campaign to renew the insurance on the Fleet. Mannion was an office worker, mainly clerical, and was not a broker. As he described his job at CDL, he was employed as "a technical back-up staff to the brokers. I was not employed as a broker" (Ex. 48, p. 57). Before December, 1975, Mannion had been employed in the "Greek hull depart-ment" at Stewart Wrightson, on the "internal side", doing "paper work" (Ex. 48, pp. 52, 56). While at Wrightson, Mannion had some dealings with APA, mainly by telex, and had met Roland Pardo (Ex. 48, pp. 7, 57).

Under the supervision of Lambert, Mannion worked on the papers for the effort to renew the Fleet insurance in and after September, 1976. Mannion prepared and sent out telex messages offering the renewal "to the overseas market" (Ex. 48, p. 9). He prepared "one master telex" and sent this out "to the various overseas people" (Ex. 48, p. 15). Examples of this telex, sent out September 6, 1976, may be seen in Exs. X, Y, Z, AA, AB, AC, AD, AF, BO, BT and CB. The dollar figures for losses in the then current 75/76 insurable year were not given in this telex. Instead, the loss record for 75/76 was stated as a 38% debit balance with Leader (sold August 11, 1976) and a 73.34% credit balance without Leader. As explained by Mannion this was the method for presentation "just to sell to underwriters the fact that this could be a good write, now that the one vessel which produced the major claim had been sold" (Ex. 48, p. 15); Mannion was "instructed by Mr. Lambert that this was probably a good selling point to the underwriters" (Ex. 48, p. 15). Mannion was clear that the loss record as to Argo Leader had to be disclosed to the prospective underwriters because Leader "was part of the fleet, and therefore the figures had to be included" (Ex. 48, p. 40). Mannion was also clear that in the renewal efforts he never advised prospective underwriters of the Fleet loss figures without including the loss figures of Argo Leader (Ex. 48, p. 40). In at least one telex, Mannion in fact gave a prospective underwriter the loss figures for 75/76 in dollars with Leader, and without Leader. This was the telex to INA in Brussels (Ex. CR, T 36).

Despite the strenuous efforts of CDL, renewal for the Fleet was difficult. This, according to Mannion, was "because the record was not the best record for this type of fleet" (Ex. 48, p. 27), meaning: "Where you have a 70-odd percent debit balance, it

is never considered profitable by underwriters. It means they have lost money" (Ex. 48, p. 60).

So it was that on October 7, 1976—the day before expiration of the insurance for the 75/76 year—the renewal had not been completed; 10% of the risk had not been placed (PTO 3(xi)).

11.

In the critical situation where the Fleet insurance was expiring in a matter of hours and 10% of the renewal had not yet been subscribed, Lambert had the idea of a direct approach to APA and an attempt to sell the necessary 10% to an underwriter represented by APA. Lambert knew that the year before part of the Fleet insurance had been placed through Stewart Wrightson with an insurer who then reinsured through APA. Lambert thought APA perhaps would now subscribe directly from CDL for part of the Fleet renewal. Mannion had earlier mentioned this possibility to Lambert. (Ex. 48, pp. 57–8)

Lambert suggested that Mannion go and see Roland Pardo about taking the remaining 10%. This was the job of a broker and Mannion (not a broker) would not usually have done this job. According to Mannion, "unfortunately because of the rush on this placing there was no one of the recognized brokers available in the office at the time" (Ex. 48, p. 57).

On October 7, 1976, Mannion went to see Roland Pardo who happened to be in London and using an office just around the corner from CDL. Mannion took with him a broker's slip (or placing slip) which had been prepared in advance at CDL and which it was hoped Pardo would sign. Mannion also took with him a handwritten note, prepared "in conjunction with Mr. Lambert" (Ex. 48, p. 45), purporting to show loss figures for the Fleet in the 75/76 year (Ex. 4).

Between October 8, 1975 and October 7, 1976, Pardo had received no information from CDL, Stewart Wrightson or from anyone else concerning any loss or damage to any ship of the Fleet. Pardo so testified (T 593).

In his testimony (by deposition) Mannion did not show a very good memory of the discussion between him and Pardo on October 7, 1976 (Ex. 48, pp. 41–46). The findings as to this discussion are largely based on the testimony of Pardo.

Mannion telephoned Pardo on October 6 and asked if APA would entertain business from CDL; Pardo replied that it would depend on the merits of each risk presented. During the telephone talk Mannion mentioned the Amership Fleet and it is a fair inference that they arranged to see each other the next day.

Mannion saw Pardo the next day in the offices Pardo was then using in London. So far as appears, they were alone. Mannion showed Pardo a broker's slip for the Amership Fleet renewal (Ex. 5), unsigned by any underwriter and intended for Pardo's signature. Mannion also showed Pardo the handwritten note purporting to show Fleet losses in the 75/76 year (Ex. 4).

The slip presented to Pardo, as its top line, had the following in typed capital letters: "WARRANTED FOLLOWING MAIN LONDON SLIP LEAD BY LLOYD'S UNDERWRITER HLQ". Pardo asked Mannion why he (Pardo) was not being shown "the main London slip, as was customary in the industry" (T 596). Mannion's reply was that they were approaching other underwriters, that Mannion "was not in possession of the main London slip, which was being at that time shown around the market" (T 596). It is believed that this reply of Mannion was untruthful, that CDL then had in its office the slip signed by HLQ, and that it was not then nor at any other time shown around the market nor to Pardo in order to conceal that the "lead" underwriter at Lloyd's had taken only ⅛ of 1% of the risk. No evidence has been found in the record that the slip signed by HLQ was ever shown to any other underwriter.

Pardo asked Mannion what percentage line the HLQ Lloyd's syndicate had taken. Mannion said he did not know, that he had not obtained the HLQ signature. Pardo

asked if HLQ had taken the normal lead line, between five and seven and a half percent. Mannion "simply nodded" (T 600). Pardo asked Mannion to provide him with the information concerning the percentage of risk HLQ had undertaken. Mannion said he would bring to Pardo at a later date the "main London placing slip", but he never did (T 598).

As to the top line of the slip presented to Pardo ("Warranted Following Main London Slip Lead by Lloyd's Underwriter HLQ"), Lambert testified that when Mannion first approached Pardo or discussed the slip with him, "Mr. Pardo requested that the slip be retyped with the wording across the top" (T 217). The witness is believed to be mistaken. He could only be relying on hearsay from Mannion and Mannion in his deposition testimony does not support such a statement. Lambert has no testimonial knowledge on the point. Pardo denies that he made any such request and affirms that the slip (Ex. 5) was in its present form when first presented to him (T 599). It is found that Pardo testified accurately and that Lambert and Mannion themselves, on their own initiative, devised the wording of the top line of the slip (Ex. 5) before it was first presented to Pardo.

As to the loss figures on the handwritten note shown to Pardo, this reads in relevant part as follows (Ex. 4):

Figures on present fleet excluding "Argo Leader" sold August 1976 and "Coral Arcadia" which to attach on inception renewal

| | Net Prems. | Claims Pd | Claims O/S |
|---|---|---|---|
| 1975/76 | US$631,006 | US$ NIL | US$175,000 C/B 72.27% |

Pardo asked if these were the only statistics available; Mannion said he did not know but would check. In fact, since September 15, 1975, CDL had had the loss figures on the Fleet from the period beginning October 8, 1972 (Ex. C). Pardo asked Mannion for the loss statistics for the year 75/76 plus three years before that, which he described as "customary" (T 602). Neither Mannion nor anybody else ever supplied or showed APA the requested figures nor any statistics other than the handwritten note (Ex. 4) described above.

During the same discussion on October 7, Mannion asked Pardo, because of the closeness of the renewal date, if he would sign "on the actual slip" presented so that Mannion could confirm to the owners that the Fleet had been covered (T 604). Pardo did so, adding, after a discussion with Mannion, the following below his signature (Ex. 5):

10.00 of values subject *no* compensation in account with the 12 months at 8.10.75 placing thru Stewart Wrightson (Marine) Ltd. Warranted premiums payable on due dates. (emphasis in original)

It is believed that this means that the underwriter represented by APA was accepting 10% of the risk on the Fleet renewal for 76/77; that this meant 10% of the values shown in the upper part of the slip ("Vld" is presumably "valued"); that [beginning a separate topic] the premiums or any other amounts due to APA for the insurer from the shipowner could not be set off as debits to the account between the shipowner and Wrightson for the Fleet insurance in 75/76 where there might be credits for losses payable under the 75/76 insurance and where a dispute existed between CDL and Wrightson (T 607); and [to make the point doubly clear] that CDL for the shipowners was guaranteeing that the premiums would be paid in cash or equivalent on the dates where due according to the policies without any set offs of any kind. The word "warranted" meant "warranted by the shipowners" through CDL.

The 10% risk accepted by Pardo for defendant Ausonia was the highest or second highest percentage accepted by any single underwriter. This appears from the list of underwriters and their percentages, a part of Exhibit 70; the list shows "Compagnie Libanaise", etc., as having accepted 14%; it is believed that "Compagnie Libanaise" was acting for a group of underwriters but no evidence of this has been found in the record; if "Compagnie Libanaise" was acting alone, defendant Ausonia accepted the

second highest percentage of all underwriters.

After Pardo signed the placing slip on October 7, 1976, he gave the original to Mannion and retained a process copy for his files. Mannion took the original slip back to the CDL office, showed it to Lambert, reported his discussion with Pardo, and placed the slip in the files; specifically he told Lambert that Pardo did not want premiums due Ausonia stopped because of any claim dispute with Wrightson and that Pardo wrote on the slip that "he wants his premium on due dates" (Ex. 48, p. 47).

APA later confirmed to CDL the agreed terms of the insurance (Ex. 7). As to premium payments, it was stated:

Warranted premium instalments paid on due dates and paid on time with no compensation of Account with Stewart Wrightson (Marine) Ltd. 1975 placing.

CDL later issued "closing instructions" to APA for the policies of insurance to be executed by Ausonia, the insurer principal of APA (Exs. 10, 11, 12) The "closing instructions" were undated and while cryptic were clear at least as to the months when premiums were due; they were payable in four instalments: in October, 1976 and in January, April, and July, 1977.

It seems that in London the insurance policies or contracts are often written and prepared by the broker for the insured, sent to the agent for the underwriter, executed by the underwriter, and returned through the chain. The policies on which this action was brought are on printed forms of CDL and were evidently prepared by CDL (Exs. 13, 14, 15). They are signed by Pardo as "Underwriter" on the first page. From the policy it is not possible to determine the identity of the "Assurers" but both sides seem to agree that defendant Ausonia is the party contracting as the assurer and a rubber stamp with the name "Ausonia" is, with manual initials (or a signature) on the back. There are two typed sheets taped to the policy, on one of which is, among other provisions, the following: "Premium payable quarterly". Since the insurance takes effect on October 8, 1976, the contract, against the background of the "closing instructions", must mean that the premium is due October 8, 1976, January 8, 1977, April 8, 1977, and July 8, 1976.

12.

One of the puzzling aspects in this case is the meaning of the words on the top line of the broker's slip presented by Mannion to Pardo and signed by Pardo for Ausonia. These words, which do not appear on other such slips in evidence (Exs. 2, 3), were (Ex. 5): "Warranted Following Main London Slip Lead by Lloyd's Underwriter HLQ". Plaintiffs contend (Main Post-Trial Brief, p. 6) based on Lambert's testimony (T 214, 217), that these words were put on the slip at the request of Pardo. The contention and testimony are rejected. It is found that the words were devised by Lambert and Mannion and were on the slip when first presented to Pardo.

Plaintiffs contend that the top line on the slip "warranted that Ausonia would follow HLQ" (Main Post-Trial Brief, p. 23), that the top line on the slip "warranted that Ausonia would follow the lead underwriter in London" (same Brief, p. 13), and that the top line on the slip was the equivalent of the "follow London" clause which is sometimes used in marine insurance policies (same Brief, pp. 13, 14).

There is a "follow London" clause known to the insurance business, but it is a clause of the *contract*, of the policy—not a notation on a placing slip. Moreover, the "follow London" clause is plain and specific. An example may be found in *Navegacion Goya v. Mut. Boiler & Mach. Ins.*, 411 F.Supp. 929, 933 fn. 2 (S.D.N.Y.1975) as follows:

This clause, referred to as the London Following Clause, states:

This insurance is subject to the same gross rate, terms and conditions as British Underwriters and it is agreed to follow British Underwriters in regard to alterations, extensions, additions, endorsements and cancellation and also in regard to surveys and set-

tlement of claims and returns including appointment of surveyors and attorneys.

There is nothing in the evidence to suggest any reason why CDL would want a "follow London" clause in insurance policies being negotiated in October, 1976. And if there were some reason, it would be expected that the "follow London" clause would be a part of the contract. It was CDL that prepared the policies on its own forms (Exs. 13, 14, 15). But there is no "follow London" clause, or anything like it, in the policies in suit, so far as the Court can find.

Against the background circumstances at the time, the most logical purpose of the top line of the slip would seem to be to substitute for showing Pardo the slip signed by HLQ, the ⅛ of 1% "lead". It is a warranty by CDL that the terms and conditions of the slip presented to Pardo (Ex. 5) are "following" (that is, are the same as) the terms and conditions negotiated with the "lead" underwriter. This seems to be reflected in the testimony of Pardo at trial when asked whether, when he first saw the slip, he found the words on the top line "unusual". His answer at trial was (T 598–9):

> Since I was not being asked to review the main London slip at the time I was presented with this risk and I was assuming that the main London slip was led by the HLQ syndicate, I believed the warranty at the top of the slip was adequate and correct procedure.

It is noted that when asked at a deposition what the words "mean in the market", Pardo answered (Ex. 51, pp. 11–12): "In this case, or in any other case, that you would follow the lead underwriter". While it must be highly doubtful that the words have any recognized meaning in the market, Pardo's just quoted answer adds confusion as to their meaning.

In any event, it is not necessary for a decision in the case at bar that the meaning of the top line on the slip be established. The contracts in suit may be avoided by defendant Ausonia for the breach of good faith by the insureds, and further points need not be reached.

13.

Before discussing the application of principles of law to the facts, the question arises as to what law is to be applied. The plaintiffs contend, very late in so doing, that English law governs; the defendant contends that American law governs.

The policies are on forms used by the London insurance industry and, presumably in order to make insurance more saleable to large American customers, these policies enable an insured, not only to sue the insurer in the United States but also (at the option of the assured) to have American law applied.

The three policies on which these actions are brought seem to incorporate other terms and provisions referred to on two typewritten slips of paper attached by adhesive tape to one of the pages of each policy. One of the references is to "C.D.L. Clauses". Another policy in evidence (Ex. 16) by the Lloyd's underwriter for 0.120% of the risk (reduced for some reason from 0.125%) has attached to it a mass of papers, one of which is entitled "Usual C.D.L. Clauses". These clauses are believed meant to be incorporated into the policies in suit. One of the "Usual C.D.L. Clauses", opposite the words "New York Suable Clause", reads in relevant part as follows:

> The place of actual and physical issue and delivery of this policy is the City of London. Nevertheless at the option of the assured and as between assured and assurers the place of issue and delivery of the policy shall be considered the City of New York and all matters arising hereunder shall be determined in accordance with American Law and Practice.

> Any suit hereunder may be brought against these insurers in any court of competent jurisdiction within the United States of America. The summons and other legal processes may be served on the assurers hereon by and on behalf of the assured by ... each of whom the assurers hereon hereby authorise to accept by and on their behalf such sum-

mons and other legal processes against the assurers hereon in any court of competent jurisdiction within the United States of America.

Nothing is said in the policies about *when* and *how* the assured should exercise the option to have all matters determined under "American Law", and neither side has cited any authority, decision or otherwise, for the manner and time of exercise of the option.

It is not provided in the policies what law applies if the insured does not exercise the option in the "New York Suable Clause".

The reasonable interpretation of this option is that the insured may timely elect that "American Law and Practice" shall apply and that, failing such election, the law of the forum will determine the choice of law to be applied.

The conclusion reached is (a) that plaintiffs did exercise, long before trial, their option to have "American Law" applied; and (b) that even if the option has not been exercised, this Court, as a matter of choice of law, should apply "American Law".

13a.

The choice by plaintiffs to commence the actions in this Court is evidence that plaintiffs were thereby exercising their option to have "American Law and Practice" apply, in the absence of any clear declaration to the contrary at the time.

There is no declaration in the complaints that plaintiffs do not wish American law to be applied. There is no mention of English law nor of any other foreign law. On the other hand, there are averments by plaintiffs of connections between the matter in suit and the United States. It is averred that defendant is engaged in the business of insuring marine risks in the State of New York; that it has consented to the personal jurisdiction of this Court and that there are persons in New York on whom process may be served; and, in the case of Argo Merchant, that, on a voyage to Salem, Massachusetts, she grounded on shoals southeast of Nantucket, and sustained one of the casualties for which suit is brought.

The contention of plaintiffs (Reply Brief, p. 34) is that the complaints relied on the "warranty in the placing slip". This contention has no merit because the "warranty", whatever meaning it may have, is part of the fact pattern and without significance as to the law applicable.

A review of the Clerk's file shows that during the litigation, the plaintiffs have relied on American and not English law.

A memorandum is noted, filed by plaintiffs October 3, 1980, opposing a motion by Ausonia to amend its answer and for summary judgment in 78 Civ. 1186. This urges four points of law: (1) that Ausonia must pay the claim because the lead underwriter has paid; (2) that collateral estoppel cannot be applied because the judgment had been vacated; (3) that collateral estoppel cannot be applied because the burden of proof in the first action was different; and (4) that the "Liner Negligence Clause" in the policies does not bar plaintiffs from recovery. For each of these points, plaintiffs cited Supreme Court of the United States and lower federal court decisions; no English case is cited. Plaintiffs attempt to explain this (Reply Brief, p. 35) on the sole ground that collateral estoppel is a procedural rule governed by the law of the forum. Assuming this to be true for the sake of argument, it would not explain the reliance of plaintiffs on American law to support their points (1) and (4) above described and which have nothing to do with collateral estoppel.

The "Pre-Trial Memorandum of Law" for plaintiffs, filed on March 3, 1983, shortly before trial, said nothing about English law being applicable and cited some eight or ten cases, all but one of which were United States federal court decisions. The plaintiffs attempt to minimize this (Reply Brief, p. 35) by pointing out that they nevertheless relied on the purported "follow the lead" warranty, citing page 7 of their Pre-Trial Memorandum of Law. But whatever this warranty may mean, it has no tendency to invoke English law.

It appears that the first claim by plaintiffs that English law applied was on the

third day of trial—March 9, 1983. The Court put several questions to counsel. One of them was: "What law are counsel applying here?" (T 307). Counsel for defendant responded first that the laws of the United States apply (T 307). The Court asked counsel for plaintiffs if he agreed. The following ensued (T 307–08):

> MR. SMITH: No, your Honor. It is at the option of the assured whether the English or American law would apply.
>
> THE COURT: What do you say?
>
> MR. SMITH: We think the English law should apply here, your Honor.

Apparently plaintiff's counsel believed (1) that the option in the "New York Suable Clause" is between English and American law and can be exercised at any time the assured chooses; and (2) that he was exercising that option at the trial in favor of English law.

It is believed that counsel for plaintiffs is mistaken. The option is not between English and American law, but is an option to have "American Law and Practice" apply.

Under the circumstances here, it is concluded that the plaintiffs had, long before trial, exercised their option to have "American Law" applied.

### 13b.

Should the Court be in error in concluding that the option has been exercised for "American law", it would then be necessary to determine, by choice of law rules of the forum, what law applies. The parties have not agreed as to the law applicable if the option in the "New York Suable Clause" be not exercised. English law is not automatically applicable in that event, as plaintiffs seem to suppose (Reply Brief, p. 35).

■ If this Court must make a choice of law, the rules to be applied in making the choice should be federal choice of law rules: "ordinarily the forum uses its own rules for choice of law decision", as Judge Pierce (then of this Court) observed in *Navegacion Goya, S.A. v. Mutual Boiler & Mach. Ins. Co.*, 1972 Am.Maritime Cas. 650, 653 fn. 1 (S.D.N.Y.1972).

Guidance for choice of law is given in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), where we are told (at 582) that maritime law resolves conflicts "by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved". While *Lauritzen* on its facts involved a maritime tort, the Supreme Court later said (also in a maritime tort case) that its "broad principles of choice of law and the applicable criteria of selection ... were intended to guide courts in the application of maritime law generally". *Romero v. International Term. Co.*, 358 U.S. 354, 382, 79 S.Ct. 468, 485, 3 L.Ed.2d 368 (1959).

Note is taken of the relevant "points of contact" in the case at bar.

No party to this action is English. The plaintiffs are Liberian corporations and a Swiss corporation; the ships insured appear to be owned by Greeks; defendant insurer is an Italian corporation, with no office in England. The ships insured were managed and operated from New York offices by Amership, a New York corporation. One of the management tasks of Amership was to obtain insurance for the Fleet. This it did in New York by employing Leeds, a New York corporation, with its only offices in New York. Counsel for plaintiffs in all insurance matters, from before the commencement of these actions, were in New York. Amership in New York, with the help of Leeds in New York, directed the investigation of all repairs of casualties and all claims on insurance. Amership in New York had a staff for investigations, surveys, and repairs of damage to ships; Stamatiadi, who as surveyor for the owners, was at the place of repairs, made his headquarters at Amership in New York and reported there. Leeds, for reasons of economy, bought insurance on the London market and employed brokers there—CDL for the matters in suit, but Leeds directed all insurance matters from New York, specifically the adjustment of all claims on insurance. Leeds in New York prepared all the statements used in

adjusting these claims and all records in that regard and otherwise in respect of Fleet insurance were kept in New York. All banking matters connected with insurance were done in New York, as witness the assignment to Bank of America of claims against insurers, already described. CDL negotiated the Ausonia policies in suit with Pardo in London, but this was a happenstance; Pardo happened to be in London at the time but his company had no offices there, he was there from time to time, and in total spent only a third of his time in England, the rest "overseas" (T 574). Because of its poor loss record, Fleet insurance could not be sold to London underwriters like Lloyd's and ILU members. The list of underwriters for the policies in suit (Ex. 70) indicates that nearly all were, like defendant here, outside of England. Very little of the risk appears to have been placed in England. The other underwriters, judging by their names, were consistent with the strategy adopted by Lambert in the beginning, as he testified: "to obtain a small lead in the London market and to place the business around the world" (Ex. HZ, p. 15). Defendant did not execute the policies in suit nor the "cover notes" in England, but in Italy. All of the values expressed in the policies, the claims, the premiums, and otherwise, were in United States Dollars. Under the policies, all losses were payable in United States Dollars to plaintiff Armco, the mortgagee, in Switzerland (PTO 3(xi)). The damages for which these actions are brought are not alleged to have been suffered in or near England; the heaviest damage, the total loss of "Merchant", occurred near Nantucket Island, Massachusetts.

There seems to be no English interest which would be in any way affected by an application of American law in this case. The contracts themselves recognize that, at the option of the non-English assured, American law will be applied. Very few of the insurers were English, and those who were bore very little of the risk.

■ The reliance of plaintiffs seems primarily based on the argument that the "following" line typed on the top of the placing slip is an agreement by Ausonia that it will follow HLQ, the so-called "lead" underwriter with one-eightieth of the risk borne by Ausonia, in all matters of financial substance. As already indicated, this is not believed to be the correct reading of the line. But even if it is correct, an agreement to follow the "lead" underwriter does not in any way imply an agreement that English law shall apply to the contract nor does it indicate in any way that English law should apply. A very clear "London Following Clause", as opposed to the ambiguous words here used, was before this Court in *Navegacion Goya S.A. v. Mutual Boiler & Mach. Ins. Co.*, 411 F.Supp. 929 (S.D.N.Y.1975). Plaintiffs made the same argument for English law as plaintiffs in the case at bar. Judge Pierce, then a District Judge, rejected the argument in these words (at 934):

> Plaintiffs' arguments that English law should govern must fail. Plaintiffs have not shown that it was the intent of the parties that the inclusion of the London Following Clause meant that English law should apply.

If a choice of law must be made, it is concluded that American law, and not English law, should govern in the case at bar. Of course, "American law" is a term which must be made more specific.

■ In the *Navegacion Goya* decision above cited, this Court stated the principle as follows (411 F.Supp. at 934): "state law governs unless there is a well settled federal admiralty rule applicable to the particular issues of the case". This is the principle laid down in *Wilburn Boat Co. v. Fireman's Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955). There is a "well settled federal admiralty rule" for the most important issue in the case at bar and, at least as to that issue, federal admiralty law should be applied. There are believed to be no significant differences between federal admiralty and New York law as to that, or as to any other, issue in the case at bar.

14.

The most important issue in the case at bar arises from the concealment by CDL, acting as representative of the shipowners, of material facts from Pardo, acting as representative of the underwriter Ausonia. What little information CDL did disclose to Ausonia was untrue.

It is not necessary that plaintiffs prove that CDL had an intent to conceal, although there appears to have been such an intent. This intent, in respect of marine insurance, is irrelevant. As the Supreme Court said many years ago in *Sun Mutual Ins. Co. v. Ocean Ins. Co.*, 107 U.S. (17 Otto) 485, 510, 27 L.Ed. 337 (1882), with respect to marine insurance: "The duty of communication [of material facts], indeed, is independent of the intention, and is violated by the fact of concealment even where there is no design to conceal". Moreover, the owners, Amership and Leeds, were fully informed as to the loss record of the Fleet.

There can be no dispute about the principles of law applicable to marine insurance contracts.

Mr. Justice Story spoke for the Supreme Court in declaring the general principle as far back as 1828, in these words (*McLanahan v. Universal Ins. Co.*, 26 U.S. (1 Pet.) 170, 185–6, 7 L.Ed. 98):

> The contract of insurance has been said to be a contract *uberrimae fidei*, and the principles which govern it, are those of an enlightened moral policy. The underwriter must be presumed to act upon the belief, that the party procuring insurance, is not, at the time, in possession of any facts, material to the risk, which he does not disclose; and that no known loss had occurred, which, by reasonable diligence, might have been communicated to him. If a party, having secret information of a loss, procures insurance, without disclosing it, it is a manifest fraud, which avoids the policy. If, knowing that his agent is about to procure insurance, he withholds the same information, for the purpose of misleading the underwriter, it is no less a fraud;

for, under such circumstances, the maxim applies, *qui facit per alium facit per se*. His own knowledge, in such a case, infects the act of his agent, in the same manner, and to the same extent, which the knowledge of the agent himself would do. And even if there be no intentional fraud, still, the underwriter has a right to a disclosure of all material facts, which it was in the power of the party to communicate, by ordinary means; and the omission is fatal to the insurance. The true principle deducible from the authorities on this subject is, that where a party orders insurance, and afterwards receives intelligence material to the risk, or has knowledge of a loss; he ought to communicate it to the agent, as soon as, with due and reasonable diligence, it can be communicated, for the purpose of countermanding the order, or laying the circumstances before the underwriter. If he omits so to do, and by due and reasonable diligence, the information might have been communicated, so as to have countermanded the insurance, the policy is void.

Again with reference to marine insurance, the Supreme Court in 1882 quoted with approval a passage from a treatise by Duer containing this sentence (*Sun Mutual Ins. Co. v. Ocean Ins. Co.*, 107 U.S. (17 Otto) 485, 510–11, 27 L.Ed. 337):

> It is the duty of the assured to place the underwriter in the same situation as himself; to give to him the same means and opportunity of judging of the value of the risks; and when any circumstance is withheld, however slight and immaterial it may have seemed to himself, that, if disclosed, would probably have influenced the terms of the insurance, the concealment vitiates the policy.

Our Court of Appeals took note of the marine insurance principle when it extended the principle to insurance against losses on the financing of fleets of taxicabs in *Hare & Case v. National Surety Co.*, 60 F.2d 909, 911 (2d Cir.1932) (L. Hand, Swan, Chase, JJ):

An insurance contract is a contract *uberrima fides;* hence known changes in conditions material to the risk which occur between the opening of negotiations for insurance and the issuance of the policy must be divulged .... This rule, originating in marine insurance, was extended in England and in a few early American cases to other types of insurance.

Judge Pollack stated the principle a few years ago in *Contractors Realty Co. v. Ins. Co. of N.A.,* 469 F.Supp. 1287, 1294 (S.D.N.Y.1979):

It is undeniable that parties to a contract of marine insurance must be held to a standard of the highest fidelity in their dealings. The doctrine of *uberrimae fidei* obligates the assured to volunteer information which might have a bearing on the scope of the risk assumed, and the failure to do so will allow the insurer to avoid the policy.

Judge Pollack cited and seems principally to have relied on *Gulfstream Cargo v. Reliance Ins. Co.,* 409 F.2d 974 (5th Cir. 1969), an opinion frequently cited in this and other Circuits, written by then Chief Judge John R. Brown, an admiralty lawyer of great distinction. The opinion cites with approval (at 981 fn. 20) the following from 45 C.J.S. Insurance § 645a:

Contracts of marine insurance are *uberrimae fidei* and there is an obligation voluntarily to disclose all facts and circumstances which are material to the risk and not within the knowledge of both parties. * * * It is immaterial that information received by insured is in fact untrue, and the policy is avoided if he, without knowledge of its untruth, failed to disclose it. Where the insurance is effected through an agent or broker, insured must exercise diligence to inform such agent or broker of the facts of which he is possessed.

In marine insurance, contrary to the general rule applicable to other kinds of insurance discussed *supra* § 473(3), any omission to communicate a material fact which insured is under an obligation to disclose will vitiate the policy whether such omission is intentional or results from mistake, accident, forgetfulness, or inadvertence; and fraud is not necessary.

The opinion also contains this statement (at 981 fn. 20):

The stringent requirements enveloped in the Latin phrase *uberimae fidei* are reflected by the classic definition:

The most abundant good faith; absolute and perfect candor or openness and honesty; the absence of any concealment or deception, however slight. A phrase used to express the perfect good faith, concealing nothing, with which a contract must be made; * *. Black's Law Dictionary 1690 (4th ed. 1951).

The law of New York is the same as federal admiralty law, just set out, as conceded by plaintiffs (Reply Brief, p. 36).

*Stecker v. American Home Fire Assur. Co.,* 299 N.Y. 1, 84 N.E.2d 797 (1949), involved insurance against loss of or damage to furs. The insured had failed to disclose a criminal conviction six years before issuance of the policy. He had been asked no questions. The issue was whether the "ordinary" New York rule applied, in which event, non-disclosure would not void the policy, or whether the stricter "marine" New York rule applied, in which event the non-disclosure would void the policy. The Court of Appeals described the two New York rules, and decided that the "ordinary" New York rule applied. To describe the "marine" New York rule, the Court of Appeals quoted from an earlier opinion (*Gates v. Madison County Mut. Ins. Co.,* 5 N.Y. 469, 474):

In marine insurance, the insured is bound, although no inquiry be made, to disclose every fact material to the risk, within his knowledge.

The Court of Appeals of New York made an interesting explanation of the reason why the disclosure requirements of marine insurance law were so strict (299 N.Y. at 6–7, 84 N.E.2d 797):

The reasons which brought into being the strict marine insurance law doctrine

as to disclosures, go far back into the early days of marine insurance, when sailing ships in far-away seas were insured in London by underwriters who could get no information except from the shipowners.

### 14a.

In accepting marine risks for Ausonia, Pardo considered that the "most important fact" is "the profitability of the business [for the insurers]" (T 615). This seems entirely in accord with common sense. The "profitability" of the Fleet is judged by the past record of its claims against insurers, paid and outstanding, compared to the premiums paid to insurers.

No information whatever was given by plaintiffs to Ausonia about Fleet claims paid and outstanding and premiums paid before October 8, 1975.

The fact was that the insurers, in the three-year period 10/8/72–8/12/75, paid claims to the Fleet and had Fleet claims outstanding of $4,172,790 more than the premiums paid by the Fleet. The insurers lost $4,172,790 on the insurance of the Fleet in that three-year period. This was a debit balance of about 250%. Nothing was disclosed to Pardo about these losses.

### 14b.

The only information disclosed by plaintiffs to Pardo was that contained in Ex. 4, shown to Pardo by Mannion on October 7, 1976. This purported to give figures for the year 10/8/75–10/8/76 excluding Leader, which was sold August 11, 1976.

There was no reason consistent with good faith for excluding Leader figures from Ex. 4 for the period while Leader was a ship of the Fleet. Mannion testified that Leader figures were given by CDL to all prospective underwriters, and had to be given because Leader "was part of the Fleet" (Ex. 48, p. 40). The evidence thus shows that, except in the one instance of Pardo, the results both with and without Leader had earlier been given by CDL in debit and credit percentage figures to all prospective underwriters even when dollar figures were not disclosed. According to the CDL percentage figures, a 38% debit balance occurred in the then current year with Leader and a 73.34% credit balance occurred without Leader (for example, Ex. X). But Pardo was approached at the last minute. With the then year's insurance about to expire, CDL was most anxious to place the final 10% of a renewal with Ausonia. Had CDL included the Leader figures, thus necessarily disclosing a debit balance, Pardo would have declined the risk; he so testified (T 620). Leader figures were therefore excluded from Ex. 4 and only a credit balance of 72.27% was shown to Pardo.

The paper, Ex. 4, shown to Pardo without the Leader figures was additionally inaccurate and misleading because a number of substantial claims other than those for Leader, were also omitted.

Exhibit 4 shows outstanding claims by the Fleet (excluding Leader) of $175,000 for the year 75/76. No evidence has been found in the record showing how this figure was reached. Presumably it was a self-serving estimate by Lambert and Mannion to induce Pardo's acceptance. The evidence establishes that this figure is much too low.

The analysis in Section 8 above indicates that in the year 75/76 the claims actually paid and outstanding for all the ships in the Fleet (including Leader) were about $2,551,000. This includes $732,000 for Leader. Subtracting this amount from the $2,551,000 leaves $1,819,000 as the claims actually paid and outstanding for the 75/76 year excluding Leader. This figure of $1,819,000 in claims for 75/76 is to be contrasted with the $175,000 which was represented to Pardo as the claims for that year; the actual claims were more than ten times what they were represented to Pardo to be.

The true loss to insurers for 75/76 excluding Leader can be calculated: Premiums were $631,000; claims paid and outstanding were $1,819,000; and the loss to insurers was thus $1,188,000. This is a *debit* balance of about 188%, as contrasted with CDL's representation of a 72.27%

credit balance in favor of the insurers for the same year.

The Leader figures should have been included in the Fleet figures in Ex. 4. The expert witness testified that, in statistics presented to prospective underwriters, figures should be included for a ship sold for the insurable year in which the sale was made; that disclosing the sale and its date is not adequate without the profit or loss figures for the year up to sale; and that the reason for this is that management of the Fleet is a factor to be considered by prospective underwriters (T 386–7). Mannion himself testified that Leader figures had to be, and were, given by CDL to all prospective underwriters because Leader "was part of the Fleet" (Ex. 48, p. 40). In the face of this testimony, Mannion was unable to "recall" why he did not show Leader statistics for Pardo on Ex. 4; he had "no recollection" (Ex. 48, p. 45). It was Mannion who wrote Ex. 4; he "drafted" it "in conjunction with" Lambert (Ex. 48, p. 45).

■ The true loss to insurers for 75/76 including Leader has been calculated in Section 8f above: Premiums were $656,000 (in round figures, Ex. CR); claims paid and outstanding were about $2,551,000, or a net loss to the insurers of about $1,895,000, a debit balance of about 288%, as contrasted with CDL's representation of a 72.27% credit balance (excluding Leader) in favor of the insurers for the same year.

### 14c.

The fact was that the insurers, in the four-year period 10/8/72–10/8/76 (including Leader to the date of sale) paid claims to the Fleet and had Fleet claims outstanding of $6,067,790 more than the premiums the insurers received from the Fleet. The insurers thus lost $6,067,790 on the insurance of the Fleet in that four-year period. This was a debit balance of about 260%. Nothing was disclosed by plaintiffs to Pardo about these losses.

### 14d.

CDL did not disclose to Pardo that HLQ (a syndicate at Lloyd's), the so-called "lead" underwriter, had taken only ⅛ of 1% of the risk, one-eightieth of the 10% risk which CDL was pressing Pardo to accept for Ausonia. Nor did CDL disclose to Pardo that HLQ, by taking ⅛ of 1%, had cut in half the already small percentage of ¼ of 1% taken by HLQ the year before.

The lead underwriter by custom and practice in London takes from 5% to 7½% of the risk and normally takes at least 5% of the risk. This would necessarily follow from the lead position; if other underwriters are expected to follow the lead underwriter as to rates of premiums, payment of claims and the like, that lead underwriter should have a substantial stake in the venture, not a mere nominal or token interest.

The failure to disclose the interest of the lead underwriter seems to have been deliberate on the part of CDL. The slip signed by HLQ was not shown to Pardo. The reasonable inference is that it was not shown because it would reveal the inconsequential risk percentage accepted by HLQ. It is the custom and practice for other underwriters to sign the same card as the lead. It seems evident that in order to conceal the small interest of HLQ, CDL did not follow this custom here.

Having a lead underwriter with so small an interest as HLQ was inconsistent with the standards of Lloyd's and, as earlier described, CDL was later censured for the practice by the Committee of Lloyd's.

### 14e.

The evidence points to only one conclusion: that CDL, as representative of the plaintiffs, violated the duty of utmost good faith imposed on the insured party to marine insurance. The consequence is that defendant Ausonia may avoid the policies it issued and is entitled to judgment in its favor.

There was no disclosure to Pardo of the enormous losses continuously suffered by the insurers of the ships of the Fleet from October 8, 1972 up to October 7, 1976. Instead Pardo was shown a handwritten paper stating that, after excluding Leader, there was a credit balance for the year

75/76 of 72.27%—a purported profit to the underwriters in that year. This was untrue and misleading.

It is not that the assured was obliged to inform Pardo of the precise dollars and cents total of each claim paid and outstanding in each year, if the precise figures were not known. As to some claims, precise figures were not yet known by October 7, 1976 when Pardo accepted the 10% risk. But utmost good faith required that everything then known to the assured about the claims be disclosed to Pardo. In fact, practically nothing was disclosed to Pardo. He was not told of the claims outstanding in the 75/76 years, of the cause of the damage or loss to the ships, of the nature of the damage to the ships, of the expected extent of the repairs, of the cost of the repairs to date, of the reports received from the Master and from the owner's surveyor, of the estimated cost of repairs, and the like. Neither was Pardo told of the minute percentage of risk taken by the "lead" at Lloyd's nor that this "lead" had halved its risk in the 76/77 year from the small percentage taken in the prior 75/76 year. On the contrary, Pardo was led to believe that the "lead" at Lloyd's had taken the normal lead risk of at least 5%. But as quoted by the Supreme Court, in *Sun Mutual, supra:* "It is the duty of the assured to place the underwriter in the same situation as himself ...." The shipowners, as the assureds, and Leeds, as their principal representative, were under a duty to see that CDL, their representative dealing with prospective underwriters, was supplied with all available material facts to discharge the duty of disclosure. This rule has been earlier quoted herein from the *Gulfstream Cargo* opinion of then Chief Judge Brown: "Where the insurance is effected through an agent or broker, insured must exercise diligence to inform such agent or broker of the facts of which he is possessed."

Clearly, the matters which were not disclosed by the plaintiffs, and those which were disclosed in an untrue and misleading manner, were highly material to defendant's decision to insure the Fleet. That such facts were material would be clear even to a person without experience in the marine insurance industry.

Pardo testified, and his testimony simply expresses common sense, as to the factors he takes into consideration in accepting marine insurance risks as follows (T 615–16):

A. The most important fact, as far as I am concerned as an underwriter, is the profitability of the business you are presented with.

Secondly, in the case of marine hull business such as this, I considered the reputation and the knowledge of the shipowner as well as the broker.

I consider who the lead underwriter is and the percentage line he normally assumes.

I consider the rates of the insurance. I consider the conditions of the insurance.

Pardo further testified, and his testimony is accepted, that when a ship of the Fleet is sold, he generally takes into consideration the loss statistics of that ship even though it is no longer included in the Fleet (T 616). His explanation was as follows (T 616):

Well, it is not so much the ship which counts that has been sold, it is the management of the fleet or the owner of the fleet that are directly relevant to the loss statistic and if the ship had been sold, the shipowner is still there and it is his loss record which will be considered and not the vehicle which creates the loss record.

You could make an analogy with a taxi cab. A driver could sustain many accidents in the streets of New York and decides to sell the battered vehicle and buy a new vehicle. He is still the driver and his loss record is still pertinent.

Pardo testified, and his testimony is accepted, that if he had been informed that the Fleet had a debit balance on its marine insurance "from 1973 forward" (presumably since the 72/73 year) he would not have underwritten the risk; that if he had been informed that the inclusion of the Leader casualties in the loss statistics

would have converted the credit balance represented to him into a debit balance, he would not have accepted the insurance for Ausonia; that the reason for his expressed judgment is: "if the business I was being offered reflected a loss, there would be no incentive to put the Ausonia or anyone else on a particular piece of business". Similarly, Pardo testified, and his testimony is accepted, that had it been disclosed that the "lead" underwriter had taken only ⅛ of 1% of the risk he would not have agreed to underwrite the risk because the tiny risk taken indicated no interest of the lead in the risk or what the lead felt about the risk [obviously that it was a poor risk]; and that had he been advised that from the year 75/76 to the year 76/77 the "lead" underwriter had cut in half its risk, this would have affected his determination because it indicated "what the lead underwriter felt about the risk he was underwriting". (T 620–24).

The Court questioned Pardo sharply about his acceptance of the risk after he had asked Mannion for the loss figures of the Fleet and for the percentage of risk taken by HLQ and had received no information in response (T 622–24). Pardo explained that he was being pressed to accept "what apparently seemed to be profitable business" and that by asking for more information he "put the onus of disclosure" on CDL (T 622). He believed that if investigation by Mannion had developed "any facts which needed further [elucidation] or disclosure to me on that date he [Mannion] would have returned with that material information" (T 623). When asked by counsel for plaintiffs why he did not cancel the insurance when he did not receive the information requested from CDL, Pardo answered (T 688):

> I assumed that if there was any material fact which needed to be disclosed to me and which would have affected my judgment, Mr. Mannion would have returned with it. As he didn't, I assumed the information presented to me and as shown to me when he came to see me on October 7, 1976 was accurate and, therefore, I allowed the Ausonia's participa-

tion to stand on that basis and on that understanding.

Pardo further testified that he trusted London brokers and relied on them, specifically Mannion, to disclose material facts and relied on the information they did disclose (T 623–24).

The Court is satisfied that Pardo believed that there was nothing adverse to the risk he was accepting, and that had there been anything adverse to that risk in the information he had requested from CDL, Mannion would have returned and made disclosure. In the light of hindsight, this was undoubtedly naive and imprudent but it is not a defense to the breach of good faith by plaintiffs.

The conclusion is that plaintiffs failed to disclose to defendant Ausonia through their representatives material facts concerning the insurance risks in suit; and that, had disclosure been made, the Fleet would not have been insured by defendant Ausonia. It is also concluded that the plaintiffs, through their representatives, misrepresented to defendant Ausonia in Ex. 4 the loss record of the Fleet for the 75/76 year, that this was a material fact, and that defendant Ausonia relied on the misrepresentation in insuring the Fleet.

Defendant Ausonia is entitled to avoid the policies in suit.

The foregoing contains the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

The Clerk is directed to enter judgment in each action in favor of defendant, with costs.