HOUSTON CASUALTY COMPANY,
Plaintiff,

v.

CERTAIN UNDERWRITERS AT
LLOYD'S LONDON subscribing to
Reinsurance Policy No. 839/DA44790,
Defendants/Third Party Plaintiffs,

v.

Fenchurch Insurance Brokers, Ltd.,
Third Party Defendant.

No. Civ.A. H–97–1381.

United States District Court,
S.D. Texas,
Houston Division.

March 30, 1999.

## ORDER

RAINEY, District Judge.

Pending before the Court are Third Party Defendant's Motion to Dismiss and for Summary Judgment (Dkt.# 31), Defendants' Motion for Summary Judgment (Dkt.# 32), and Plaintiff's Motion for Summary Judgment (Dkt.# 34).

### I. FACTUAL BACKGROUND

#### A. Lloyd's London

Lloyd's London ("Lloyd's") is a 300–year–old market in which individual and corporate underwriters, known as Names, underwrite insurance.[1] Lloyd's itself is not an insurance company; it merely provides the physical premises and administrative staff and services to enable the actual underwriters to carry on their business. To increase efficiency and multiply resources, Names have joined together to form syndicates, of which there are now more than four hundred; a particular syndicate may have a few hundred or several thousand Names. Syndicates have no legal existence apart from the Names, and

1. The description in this section is a composite of those included in the parties' submissions and various judicial opinions. *See generally Indiana Gas Co., Inc. v. Home Ins. Co.,* 141 F.3d 314, 316 (7th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 339, 142 L.Ed.2d 280 (1998); *Haynsworth v. The Corporation,* 121 F.3d 956, 958–59 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1513, 140 L.Ed.2d 666 (1998); *Certain Interested Underwriters v. Layne,* 26 F.3d 39 41–42 (6th Cir. 1994); *Lowsley–Williams v. North River Ins. Co.,* 884 F.Supp. 166, 167–68 (D.N.J.1995); *Edinburgh Assurance Co. v. R.L. Burns Corp.,* 479 F.Supp. 138, 144–46 (C.D.Cal.1979), *aff'd in part, rev'd in part,* 669 F.2d 1259 (9th Cir.1982).

syndicates neither assume liability nor underwrite risks. Within each syndicate, an "active" underwriter is authorized to determine the conditions to which a risk will be subject, the percentage of risk to be assumed by the syndicate on behalf of the Names, and the percentage of risk each Name in the syndicate will assume. Thus, when the active underwriter accepts a percentage of the risk, he binds every Name in the syndicate. Each Name assumes unlimited liability for his share of the syndicate's losses, but he is liable for no other portion assumed by any other Name.

Only approved brokers are permitted to place risks with Lloyd's underwriters. Typically, a broker will prepare the "slip," a summary of the details of the risk the broker is seeking to insure (or reinsure). The broker and the active underwriter proceed to negotiate the terms and premium, indicating as much on the slip itself. The underwriter who structures the transaction with the broker is known as the "lead" underwriter; the lead underwriter's syndicate is known as the "market lead" or "leader of the market" for that particular risk. When the underwriter signs (or "scratches") the slip, a binding contract between his syndicate and the insured is formed. Having obtained the signature of the lead underwriter, the broker retains the slip and approaches other syndicates or insurance companies to secure coverage for the remaining risk. Once the broker has succeeded in procuring full coverage, he retains the slip and provides subscribing underwriters with copies of the terms and conditions of the coverage. If a claim under the insurance (or reinsurance) agreement is not outstanding, an underwriter may agree to waive issuance of a policy; the slip is then signed "on risk." Otherwise, the broker's policy department prepares the policy and forwards it to the Lloyd's Policy Signing Office ("LPSO"). The LPSO checks the policy against the slip to ensure that the policy contains all the terms and conditions of the slip. If no inconsistencies are discovered, the policy issues, often long after the initial signing of the slip.

### B. The Transaction

Plaintiff Houston Casualty Company ("HCC") is an insurance company with its principal place of business in Houston, Texas. Between December 15, 1994, and September 15, 1995, HCC insured Beech Holdings Corporation ("Beech") and its subsidiary and affiliated companies (including Budget Rent–A–Car) under HCC Policy No. 050028/35/37011 (the "Beech policy"), which provided coverage for, *inter alia,* Beech's interest in a fleet of rental vehicles. The Beech policy had limits of $5,000,000 per occurrence, with a deductible of $1,000,000 per occurrence, and in the aggregate annually, and $250,000 per occurrence thereafter. Seeking to limit its exposure under the Beech policy, HCC requested that Third Party Defendant Fenchurch Insurance Brokers, Ltd. ("Fenchurch") secure reinsurance in the London market for a portion of HCC's risk. (HCC's chairman, Stephen Way, had "broked" on the floor of Lloyd's earlier in his career and had been a Name with several syndicates; consequently, a significant portion of HCC's dealings were in the London market.) To this end, in late December of 1994, Fenchurch—in the person of Julian Hall—approached Colin Baker, the Active Underwriter for Syndicate 947, a syndicate of underwriters at Lloyd's. Syndicate 947 signed on as the lead syndicate for the reinsurance sought by HCC, and by January 6, 1995, Fenchurch had procured 100% of the coverage sought by HCC.

On April 29, 1995, the Dallas/Fort Worth area was besieged by a hail storm that damaged a number of Beech's vehicles. Beech notified HCC of the loss and requested indemnification. HCC adjusted Beech's loss at a total of $4,393,106.66 and paid Beech $4,143,106.66 (the total less HCC's deductible), $4,141,127.00 of which accounted for damage to Beech's vehicles. Another hail storm in early May caused

additional damage to Beech's vehicles, for which Beech again sought indemnification. HCC adjusted Beech's second loss at $2,439,117.39 and paid Beech $2,126,627.39 (the total less HCC's deductible). HCC apprised the Lloyd's underwriters subscribing to the reinsurance agreement (collectively the "Underwriters") of these two payments and requested indemnification of $2,267,744.39, plus loss allocated expenses of $83,720.94. The Underwriters, however, refused, and continue to refuse, to pay any amount to HCC.

The subject of the parties' dispute is the Lloyd's Standard Wording 507 Basis of Loss Clause (the "LSW 507 clause"). Before he scratched the slip, lead underwriter Colin Baker added in his own handwriting at the top of the slip the phrase "Basis of Loss Clause based LSW 507." Underwriters' Exhibit ("Ex.") 8. Baker has since explained that he meant to require the inclusion of a clause "[t]he same or substantially the same as [LSW] 507," Deposition of Colin Baker 59 [hereinafter Baker Deposition], a clause which controls the basis of loss on damaged vehicles, specifying how certain claims will be adjusted and requiring that depreciation of value must be taken into account.[2] On December 28,

1994, Fenchurch advised HCC of the addition of the new condition, Ex. 8, and on January 1, 1995, HCC returned to Fenchurch an edited version of the slip, marked up with amendments that it wished to see incorporated in the slip; that version included "Basis of Loss Clause based L.S.W. 507" typed in its "Conditions" section. Ex. 12. Fenchurch was able to announce to HCC on January 3 that Baker had assented to various additions and that 40% of the risk had been covered; a clean copy of the slip still incorporated Baker's "based L.S.W. 507" language. Ex. 13. On January 6, 1995, Fenchurch announced that 100% of the coverage sought had been secured. Ex. 17. The cover note,[3] dated February 3, 1995, listed as a condition "Basis of Loss Clause based on Dealer's Open Lot—Basis of Loss Settlement LSW 507."

On September 5, 1995—four months after the Texas hail storms—a copy of the slip forwarded by Fenchurch to HCC still contained the "based L.S.W. 507" phrase. Ex. 32. On September 18, 1995, HCC advised Fenchurch of its claims resulting from the hail storms. Fenchurch passed on the information to the Underwriters, one of whom wrote on the face of the fax,

---

2. The LSW 507 clause provides:

> In the event of a total loss to unit(s) insured hereunder Underwriters shall be liable for an amount up to the Assured's original acquisition cost plus documented improvements and betterments, less applicable depreciation (if any).
>
> In the even of a partial loss to unit(s) insured hereunder Underwriters shall be liable for the actual cost of repair. Labor rates will be calculated at seventy five percent (75%) of prevailing local bodyshop labor rates. Parts will be calculated at seventy five percent (75%) of retail cost unless the Assured's cost exceeds seventy five percent (75%) of retail cost in which case settlement will be made at Assured's cost.
>
> In the event of a partial loss to unit(s) insured hereunder and the Assured chooses not to repair or accept a settlement from Underwriters based on an appearances damage valuation then coverage hereon shall not apply unless the retail sale price of the unit(s), as a direct result of the

unrepaired damage is less than the original acquisition cost plus documented improvements and betterments, less applicable depreciation (if any) and the retail sale price equals the actual retail value of the unit(s) as determined by Underwriters at the time of loss.

> In the event that retail sale price is less than the original acquisition cost plus documented improvements and betterments, less applicable depreciation (if any); Underwriters hereon shall only be liable for the difference between the two amounts.
>
> Appearance damage shall be deemed to be damage which is cosmetic in nature, impairing only the appearance of the unit. Ex. 102.

3. "The cover note is a broker-produced document that the broker sends to the client before the policy because the policy is generally very slow in coming and it, in effect, is confirmation of coverage subject to the final policy." Deposition of Stephen Way 43 [hereinafter Way Deposition].

"We expect a full report from the Reinsured with details of the loss adjustment ... bearing in mind the basis of loss settlement· clause (LSW 507) attached to the wording." Ex. 71; Deposition of Peter Dodds 55. On January 4, 1996, in an effort finally to issue a policy, a member of Fenchurch's wording department wrote in an interoffice·memo, "[W]e have a problem. The conditions [in the slip] contain various conditions which are applicable to the original policy only and therefore we need to amend the slip to show these to be 'as original' or put them under information." Ex. 100. Adam Long, the author of those sentences, has explained,

It would appear that I made the assumption that the slip showed various conditions which were applicable to the original policy and therefore would follow through to the reinsurance policy.

Therefore, I said that these should be shown as "as original," stating they were in the original policy, or they should be put under information because, again, they were in the original policy.

Deposition of Adam Long 51 [hereinafter Long Deposition]. Among the conditions listed in the memo was the "based LSW 507" clause; no party now disputes that the Beech policy in fact did *not* have the LSW 507 clause, or one based thereon.

On January 5, 1996, Fenchurch issued Endorsement No. 3, which amended the slip to read, "Basis of Loss Clause based 507, *as original.*" Ex. 46 (emphasis added). There is consensus that the emphasized phrase signified that the LSW 507 clause, or one like it, was part of the Beech (the "original") policy. *See, e.g.,* Baker Deposition 41; Long Deposition 27; Way

Deposition Way 72; Deposition of Leonard Bateman 42; Deposition of Alan Parker 27. Duncan Bennett, in Fenchurch's technical department, prepared the endorsement, and Alan Parker, with Syndicate 947, scratched his approval. Thereafter, the LPSO, upon review of the proposed wording of the policy alongside the slip (including Endorsement No. 3), approved and stamped Policy No. 839/DA44790, *sans* the LSW 507 clause.

■ When HCC sought indemnification from the Underwriters under· the reinsurance policy, the Underwriters balked, insisting that adjustment of loss had not been performed in accordance with the LSW ‚507 clause. *See* Second Amended Answer 5 ("Pursuant to LSW 507 wording, in order for the reinsurance to ·be invoked, the vehicles must have been sold at retail and retail value obtained for those vehicles. The vehicles which form the basis of Plaintiff's claims were not sold at retail. Further, retail value was not obtained for the vehicles."). Emphasizing that the LSW 507 clause is not part of the reinsurance· policy, and that the policy provided that the Underwriters would "follow the settlements" of HCC,[4] HCC sued the Underwriters for (1) breach of contract; (2) breach of duty of good faith and fair dealing; and (3) various Texas Insurance Code violations. In turn, the Underwriters asserted counterclaims for reformation, based on mutual mistake; rescission, based on Fenchurch's material misrepresentations; and declaratory judgment.[5] The Underwriters also pursued a third party action against Fenchurch for contribution and indemnity.

---

**4.** "As its label implies, the 'follow the settlements' doctrine prevents facultative reinsurers from second guessing good-faith settlements and obtaining de novo review . of judgments of the reinsured's liability to its insured." *National Am. Ins. Co. of Cal. v. Certain Underwriters at Lloyd's· London,* 93 F.3d 529, 535 (9th Cir.1996) (internal quotations marks and footnote omitted).

**5.** The Underwriters have devoted a portion of their briefing to the defense of estoppel. Estoppel is an affirmative defense that must be pled. *See* Fed.R.Civ.P. 8(c). In an order dated February 1, 1999 (Dkt.# 46), the Court denied the Underwriters' motion to amend their pleading to include the defense of estoppel. "[A]n affirmative defense that is not asserted in a responsive pleading is generally deemed waived." *Jones v. Miles,* 656 F.2d 103, 108 n. 7 (5th Cir.1981).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Applicable substantive law determines what factual issues are material for summary judgment purposes. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disputes about material facts are "genuine," as contemplated by the federal Rule, if the evidence is such that a rational trier of fact could return a verdict for the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir.1993).

"For any matter on which the non-movant would bear the burden of proof at trial . . ., the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995) (footnote omitted). In satisfying this burden, the non-movant "may not rest upon the mere allegations or denials of the [non-movant's] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex*, 477 U.S. at 324–27, 106 S.Ct. 2548. In weighing a motion for summary judgment, the court must draw reasonable inferences from the underlying facts in favor of the nonmoving party. *See*

*Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *King v. Chide*, 974 F.2d 653, 656 (5th Cir.1992). "[M]erely colorable" evidence, however, will not suffice as a basis for opposing summary judgment, *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505, and a summary assertion made in an affidavit is not sufficient evidence to raise a genuine issue of material fact. *See Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d 557, 559 (5th Cir.1997).[6]

## III. CHOICE OF LAW

 A threshold question is what jurisdiction's laws govern this controversy. A federal court must apply the conflict-of-law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Denman by Denman v. Snapper Div.*, 131 F.3d 546, 548 (5th Cir.1998). Therefore, the Court looks to Texas choice-of-law principles. In *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex. 1984), the Supreme Court of Texas adopted for use in contract cases the "most significant relationship" approach set forth in the Restatement (Second) of Conflict of Laws § 6. *Id.* at 420–21.

### A. Statutory Directive

Under the Restatement's approach, at the first step, "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Restatement (Second) of Conflict of Laws § 6(1). HCC urges that Tex.Ins.Code Ann. § 21.42 (Vernon 1981) is just such a directive, mandating that Texas law be applied in this case. Section 21.42 provides:

> Any contract of insurance payable to any citizen or inhabitant of this State by any insurance company or corporation doing business within this State shall be held to be a contract made and entered

---

**6.** HCC has raised a number of objections to the summary judgment evidence presented by the Underwriters (Dkt.# 42). The Court emphasizes that in ruling on the parties' motions for summary judgment, it has ignored that testimony that in fact constitutes incompetent summary judgment evidence.

into under and by virtue of the laws of this State relating to insurance, and governed thereby, notwithstanding such policy or contract of insurance may provide that the contract was executed and the premiums and policy (in case it becomes a demand) should be payable without this State, or at the home office of the company or corporation issuing the same.

Assuming the reinsurance agreement at issue is indeed a "contract of insurance," *compare Stradley v. Southwestern Life Ins. Co.,* 341 S.W.2d 195, 198 (Tex.Civ. App.—Dallas 1960, writ ref'd n.r.e.) (" 'Reinsurance contracts' are not policies of insurance, nor contracts of insurance, as that term is generally understood. The parties to such a contract are engaged in a kind of joint enterprise in nature of copartnership, and do not insure property, but only engage to indemnify against liability upon policies or contracts issued to owners of property.") (quoting *Cunningham v. Republic Ins. Co.,* 127 Tex. 499, 94 S.W.2d 140, 142 (Tex.Com.App.1936)), *with Great Atlantic Life Ins. Co. v. Harris,* 723 S.W.2d 329, 330 (Tex.App.—Austin 1987, no writ) ("The true insurer is merely an insurance company or underwriter which deals only with other insurance companies as its policyholders....") (quoting John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 7681, at 480 (1976)),[7] the Court is of the opinion that the Underwriters were not "doing business within" Texas, as contemplated by the statute.

The Court is not persuaded by the Underwriters' contention Article 1.14–1(b)(2) of the Insurance Code—which excludes "the lawful transaction of reinsurance by insurers" from that article's definition of "doing an insurance business"—is conclusive. In *Great Am. Ins. Co. v. North Austin Utility,* 908 S.W.2d 415 (Tex.1995), the Supreme Court of Texas held that

Article 1.14–1, enacted ten years after Article 21.21, did not govern the scope of the term "business of insurance" as used in the latter article. *Id.* at 424. The court's analysis has equal force when applied to Article 21.42, enacted more than 15 years before Article 1.14–1. Article 1.14–1 was adopted to "provide[ ] for substituted service of process on unauthorized insurers.... Nowhere in the 'purpose' clause of article 1.14–1 did the Legislature indicate that the list of acts contained therein which constitute 'doing an insurance business' was to apply throughout the Code." *Id.*

■ However, the Court need not hold that *all* reinsurance transactions are beyond the scope of Article 21.42 to find that the immediate one is. It is true that HCC is a Texas corporation. But surely doing business with a Texas corporation is not tantamount to doing business *in Texas.* Article 21.42 may not be given extraterritorial effect so as "to regulate business outside the state of Texas." *Austin Bldg. Co. v. National Union Fire Ins. Co.,* 432 S.W.2d 697, 701 (Tex.1968) (internal quotation marks omitted). By all accounts, the Underwriters did not solicit the business of HCC. *Cf. Locomotive Eng'rs & Conductors Mut. Protective Ass'n v. Bush,* 576 S.W.2d 887, 889 (Tex.Civ.App.—Tyler 1979, no writ) (applying Article 21.42 when policy was solicited by insurer's agent). HCC engaged a Lloyd's broker for the express purpose of obtaining reinsurance on the floor of Lloyd's. The initial contracting occurred solely in London; it is acknowledged that an underwriter considers himself bound upon scratching a slip. *See Youell v. Bland Welch & Co.,* [1992] 2 Lloyd's Rep. 127, 133 (C.A.) (Lord Justice Staughton) ("[The slip] contains a concluded agreement between the parties, albeit one which they may expect, and even agree, to replace by different wording in a

---

7. The Court observes that the "consumer protection purposes of the Insurance Code," *Insurance Co. of N. Am. v. Morris,* 981 S.W.2d 667, 672 (Tex.1998), are less a concern when the insured is an insurance company such as HCC. *Cf. International Ins. Co. v. Certain Underwriters at Lloyd's London,* 1991 WL 349907, at *10 (N.D.Ill. Sept.16, 1991).

formal contract."). And while the slip can be modified, any amendments—for instance, Endorsement No. 3—required the approval of the Underwriters, in London. HCC does not suggest that any conduct beyond the initial proffer of the slip was required of HCC, and the reinsurance policy ("[d]ated in London ..." and signed and embossed by the general manager of the LPSO) has no signature line for HCC. HCC's Ex. A. Delivery of the policy to Houston, when that conduct had no relevance to the binding effect of the contract, was inconsequential. *See New York Life Ins. Co. v. Baum*, 700 F.2d 928, 931–32 (5th Cir.1983); *Metropolitan Life Ins. Co. v. Wann*, 130 Tex. 400, 109 S.W.2d 470, 472 (Tex.Com.App.1937) (citing *Boseman v. Connecticut Gen. Life Ins. Co.*, 301 U.S. 196, 57 S.Ct. 686, 81 L.Ed. 1036 (1937)). Indeed, there is no evidence that HCC ever dealt directly with the Underwriters; all negotiations with the Underwriters were conducted by Fenchurch in London. To say that the Underwriters were "doing business" in Texas would be to strip that phrase of its significance. *See Butler v. Mutual Life Assurance Co. of Canada*, 600 F.2d 532, 534 (5th Cir.1979) (refusing to apply Article 21.42 when "[n]o events regarding the making of the contract occurred in Texas"); *Singer v. Lexington Ins. Co.*, 658 F.Supp. 341, 344 (N.D.Tex. 1986) ("All of plaintiffs' dealings with respect to the policy were conducted with Platt, an Arizona broker which placed the insurance with Lexington in Massachusetts through Hall, a London broker. At no time did plaintiffs or Platt deal directly with Lexington or its representatives within Texas or anywhere else. Accordingly, Art. 21.42 does not apply."). Article 21.42 does not direct that Texas law be applied in this case.

### B. "Most Significant Relationship"

■ In the absence of a statutory directive, a Texas court must look to the principles enunciated in the Restatement (Second) of Conflict of Laws. *See Maxus Exploration v. Moran Bros., Inc.*, 817 S.W.2d 50, 53 (Tex.1991). Section 188(1) provides that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." The following contacts must be considered in determining which law governs the controversy: "(a) the place of contracting, (b) the place of negotiation, (c) the place of performance, (d) the location of the contract's subject matter, and (e) the parties' domicile, residence, nationality, place of incorporation, and place of business." *Minnesota Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735–36 (Tex.1997) (quoting Restatement (Second) of Conflict of Laws § 188(2)). As already discussed, the place of contracting and negotiation was London. HCC did offer advice and direction from its headquarters in Houston via facsimile, but that advice and direction was never aimed at the Underwriters. Face-to-face haggling always occurred in England between Fenchurch and the Underwriters, and HCC has offered no evidence of any outreach by the Underwriters. *See* Way Deposition 80 ("I can't imagine that I dealt with anybody other than through Fenchurch."); Deposition of Julian Hall 25 [hereinafter Hall Deposition] ("Q: So the underwriter really never sees or hears directly from the client; the communications come through you? A: Correct.").

HCC argues that the place of performance was Texas, but in so doing, it confuses the place of loss with the place of performance. HCC's obligation under the parties' agreement was to pay a premium; the Underwriters' obligation was to indemnify certain losses. *Where* the losses occurred did not affect either obligation. When the contract is one of payment, the place of performance seems, in truth, of no particular consequence. Under Texas law, at least, the mutual obligations would cancel each other out. "When a contract requires payment of money but does not

specify the place of payment, the place of payment is the domicile of the payor." *Temperature Sys., Inc. v. Bill Pepper, Inc.*, 854 S.W.2d 669, 675 (Tex.App.—Dallas 1993, writ dism'd by agr.). What is more, the Underwriters' obligation to perform on the agreement would apparently arise in England upon presentation of a claim to the Underwriters. *Cf. Arkwright–Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co.*, 887 F.2d 437, 439 (2d Cir.1989).

HCC also maintains that the subject matter of the reinsurance policy is "Houston Casualty's business of insurance located in Houston." The Court disagrees. The subject matter of the reinsurance policy, as identified by the policy itself, is Beech's fleet of commercial vehicles, located not only in Texas, but also across the United States *and* the United Kingdom.[8] *See Hefner v. Republic Indem. Co. of Am.*, 773 F.Supp. 11, 13 (S.D.Tex.1991) ("If [the insured] were held to have a significant relationship with each state in which insured properties are located, he would potentially be subject to twenty different state laws. By analogy, the owner of a fleet of ships would potentially be liable throughout every port city in the United States."). This factor in the analysis is just not determinative. *Cf. Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.*, 796 F.2d 821, 832 (5th Cir.1986) (holding that fact that underlying risk was located in Louisiana did not make the case a "local controversy").

■ In fact, only the last contact might be said to favor HCC, and then only slightly. HCC is a Texas corporation with its primary place of business in Texas. The Underwriters' domicile, on the other hand, has not been revealed; there is no requirement that a Name live in England, and many evidently do not. Nevertheless, it is plain that the syndicates collectively maintain offices and do business in London. In any event, the Court agrees that the "place of negotiating and contracting is more significant than the reinsured's place of business...." *International Ins. Co. v. Certain Underwriters at Lloyd's London*, 1991 WL 349907, at *11 (N.D.Ill. Sept.16, 1991); *see also Arkwright–Boston*, 887 F.2d at 439 (applying North Carolina law when reinsurer was organized, and reinsurance contract was issued, in North Carolina); *Stephens v. American Home Assurance Co.*, 811 F.Supp. 937, 946 (S.D.N.Y.1993) (applying New York law when retrocession (re-reinsurance) agreements were solicited, negotiated, executed, and performed in New York and the intermediary was located in New York).

The described contacts must be evaluated in the context of certain policy factors listed in the Restatement: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied." *Nishika*, 953 S.W.2d at 736 (quoting Restatement (Second) of Conflict of Laws § 6(2)). In the immediate case, most of these factors point in no single direction. Texas, of course, is concerned with the solvency of in-state insurers, and England has an interest in maintaining the integrity and vitality of its market for reinsurance. *See International Ins.*, 1991 WL 349907, at *11. The parties' justified expectations, however, weigh in favor of the application of English law. HCC hired a Lloyd's broker to procure reinsurance for its risk in England; that broker engaged in negotiations with various underwriters in England, entered into a contract in England,

---

**8.** The second page of the policy indicates that the vehicles are kept at "[v]arious locations in U.S.A." But the value of the vehicles is listed as $1,631,355,283, a sum that includes the value of the United Kingdom vehicles listed in the attached schedule. HCC's Ex. A.

and authored a policy that was reviewed and approved in England. Certainly all parties could have anticipated that English law would govern the terms of the contract. *See Nishika*, 953 S.W.2d at 737. The Court concludes that England has a more significant relationship to the parties and the transaction than Texas.

## C. The Effects of Application of English Law

■ The application of English law has two effects. First, HCC's Texas statutory claims are no more. Second, in those instances that English common law conflicts with that of Texas, the Court is bound to apply the former. The Court emphasizes, however, that the party championing the application of English law is obliged to demonstrate the existence of actual conflicts. *See* Fed.R.Civ.P. 44.1 ("A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice."); Restatement (Second) of Conflict of Laws § 136 cmt. h ("When both parties have failed to prove the foreign law, the forum may say that the parties have acquiesced in the application of the local law of the forum."); *Wachs v. Winter*, 569 F.Supp. 1438, 1442–43 (E.D.N.Y.1983) (citing cases). In the end, the Underwriters have demonstrated a relevant conflict only in the two jurisdictions' expression of the law of material misrepresentation.[9] As HCC concedes in its motion for summary judgment, English law does not require proof of intent to deceive by the insured, while Texas law does. *Compare*

Hanson Affidavit 7 ("In brief, under English law, a reinsurer is entitled to avoid a reinsurance contract if, during the negotiation of the contract the reinsured ... misrepresents a fact material to the business being placed....") (citing *Pan Atlantic Ins. Co. v. Pine Top Ins. Co.*, [1994] 2 Lloyd's Rep. 427 (H.L.)), *with Mayes v. Massachusetts Mut. Life Ins. Co.*, 608 S.W.2d 612, 616 (Tex.1980) (listing as an element of material misrepresentation "the intent to deceive"). This difference, and its consequences, are discussed in more detail below.

## IV. MUTUAL MISTAKE

### A. The Agency Relationship

Claiming mutual mistake, the Underwriters seek to have the reinsurance policy reformed to include the LSW 507 clause. Underlying their theory is the assumption that Fenchurch was HCC's agent. That is, HCC and the Underwriters never communicated directly; to hold HCC liable for communications made by Fenchurch, it is essential that the Underwriters demonstrate that (1) Fenchurch was HCC's agent, and (2) those communications were made within the scope of authority granted Fenchurch. *See Spring Garden 79U, Inc. v. Stewart Title Co.*, 874 S.W.2d 945, 948 (Tex.App.—Houston [1st Dist.] 1994, no writ) ("A principal is liable for the acts of its agent when the agent has actual or apparent authority to do those acts or when the principal ratifies those acts.").

---

**9.** The Underwriters briefed the English common law of equitable estoppel, mistake, and material misrepresentation. Equitable estoppel, as previously discussed, is an affirmative defense not raised in the Underwriters' pleading. And English law of mutual mistake is in no material way different from that of Texas. According to the Underwriters,

[t]he general rule is that rectification [reformation] will not be granted unless there has been a mistake in an expression which is common to all the parties. In general, a claim will only succeed if it is established, firstly that there was some prior agreement between the parties; second that this was

still effective when the instrument was executed; third that by mistake the instrument fails to carry out that agreement; and fourth, that if rectified as claimed, the instrument would carry out the agreement of the parties.

Affidavit of John Hanson 5 [hereinafter Hanson Affidavit] (citing *Agip S.p.A. v. Navigazione Alta Italia S.p.A.*, [1984] 1 Lloyd's Rep. 353, 359 (C.A.)). *Cf. Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex.1987) ("[R]eformation requires two elements: (1) an original agreement and (2) a mutual mistake, made *after* the original agreement, in reducing the original agreement to writing.").

■ Fenchurch was clearly HCC's agent. *See Foundation Reserve Ins. Co. v. Wesson,* 447 S.W.2d 436, 438 (Tex. App.—Dallas 1969, writ ref'd) ("The general rule is that . . . an insurance broker acts for the insured in making the application and procuring the policy. . . ."); *see also* Fenchurch's Motion to Dismiss and for Summary Judgment 20 ("It is uncontested that Fenchurch was acting solely as an agent of HCC in negotiating the terms and conditions of coverage.") (citing *Edinburgh Assurance,* 479 F.Supp. at 151). Nevertheless, an agent may not bind its principal in the absence of either actual or apparent authority to do so. *See East Texas Fire Ins. Co. v. Blum,* 76 Tex. 653, 13 S.W. 572, 575 (1890); *Currey v. Lone Star Steel Co.,* 676 S.W.2d 205, 209 (Tex.App.—Ft. Worth 1984, no writ).

> "Actual" authority, which includes both express and implied authority, usually denotes that authority a principal 1) intentionally confers upon an agent, 2) intentionally allows the agent to believe that he possesses, or 3) allows the agent to believe that he possesses by want of due care. . . .
>
> One who seeks to bind a principal based on the apparent authority of its agent must show that a reasonably prudent person would believe that the agent had the authority to act as he did.

*Spring Garden,* 874 S.W.2d at 948, 950.

■ The Court finds, as a matter of law, that Fenchurch's representation to the Underwriters was made within the scope of its actual authority. Fenchurch was HCC's reinsurance broker. Even if it is accepted that Fenchurch's authority was limited to "obtain[ing] a reinsurance policy that fully 'followed the settlements' " of the underlying policy, *see* HCC's Response to the Underwriters' Motion for Summary Judgment 19,[10] surely it is the case that representations regarding the terms and conditions of precisely that underlying policy are authorized. *See Polland & Cook v. Lehmann,* 832 S.W.2d 729, 738 (Tex. App.—Houston [1st Dist.] 1992, writ denied) ("An agent's authority is presumed to be coextensive with the business entrusted to his care. He may perform such acts as are necessary and proper to accomplish the purposes for which the agency was created."); *see Spring Garden,* 874 S.W.2d at 948 (noting that "actual" authority includes implied authority, that "which is proper, usual, and necessary to the exercise of the authority that the principal expressly delegates"). HCC cannot escape liability on the basis that it did not authorize Fenchurch's *specific* representations.

> In determining a principal's vicarious liability, the proper question is not whether the principal authorized the specific wrongful act; if that were the case, principals would seldom be liable for their agents' misconduct. Rather, the proper inquiry is whether the agent was acting within the scope of the agency relationship at the time of committing the act.

*Celtic Life Ins. Co. v. Coats,* 885 S.W.2d 96, 99 (Tex.1994) (citing Leonard Lakin & Martin Schiff, *The Law of Agency* 144–45 (1984)). "[S]ince the principal has selected the agent to act in a venture in which the principal is interested, it is fair, as between him and a third person, to impose upon

---

10. HCC's characterization of the scope of Fenchurch's authority is belied by Stephen Way's failure to object at any time during negotiations to the inclusion of the "Basis of Loss Clause based LSW 507" language—language that was absent from the Beech policy. In a fax to Julian Hall on January 1, 1995, Ex. 12, for instance, Way offered a number of amendments to the original slip, adding to several phrases "as original" or "and/or as original"; he did not add such a phrase to the "based L.S.W. 507" clause, and he did not insist on the clause's excision. *See* Hall Deposition 92–93. That he did not understand the contents of the clause is simply not tenable; the fifth page of a fax Julian Hall sent to Way on January 3, 1995, was a photocopy of the clause itself. Ex. 13. And the proposition that the clause was neutralized by other language in the slip, such as "Conditions to follow as original," Way Deposition 166–68, is simply not supported by the record. *See, e.g.,* Deposition of Brenda Whibley 24–25 [hereinafter Whibley Deposition].

him the risk that the agent might exceed his instructions." *Standard Distributors v. F.T.C.*, 211 F.2d 7, 15 (2d Cir.1954) (Hand, J.).

## B. Reformation

■ Reformation is a proper remedy when the parties have reached a definitive and explicit agreement, understood in the same sense by both, but, by their mutual or common mistake, the written contract fails to express the agreement. *See Champlin Oil & Refining Co. v. Chastain*, 403 S.W.2d 376, 382 (Tex.1965); Restatement (Second) of Contracts § 155.[11] The Underwriters insist that such is the case here: "Fenchurch was mistaken when it represented LSW 507 was in the underlying policy (it was not there), and Underwriters were mistaken in believing it was there (it was not). This mutual mistake about a fundamental and essential aspect of the reinsurance agreement created the foundation for reformation." Response to HCC's Motion for Summary Judgment 6. For two reasons, the relief the Underwriters seek is unavailable.

■ First, by Colin Baker's own admission, the phrase "Basis of Loss Clause based LSW 507," had no defined meaning. To him, it meant a clause "[t]he same or *substantially the same* as [LSW] 507." Baker Deposition 59 (emphasis added). He has explained, "If [substantially similar] language was presented to me ..., then I would have agreed to such language." Affidavit of Colin Baker 3 [hereinafter Baker Affidavit]. Brenda Whibley, who works for the LPSO and is presumably practiced in the art of interpreting slips, has testified, "It just says based. It

doesn't actually say that it is the LSW 507, so I would have gone with whatever had been attached to the slip and the policy documentation agreed to by the underwriter." Whibley Deposition 21. The Underwriters, then, have failed to adduce any evidence regarding the terms of the parties' "actual" contract. At best, the Underwriters have proffered evidence that tends to show that, had they understood that the Beech policy contained neither the LSW 507 clause nor a "substantially similar" clause, they would have insisted on the inclusion of one or the other in the reinsurance policy—a matter left for negotiation. Such showing does not suffice. *See National Resort Communities v. Cain*, 526 S.W.2d 510, 513 (Tex.1975) ("The one who seeks to have equity change the writing ... must prove the *true agreement* of the parties....") (emphasis added); *Champlin Oil*, 403 S.W.2d at 382 (requiring proof of a "definite and explicit agreement" between the parties). "[R]eformation necessarily contemplates alteration or amendment of the policy language to reflect the true intent of the parties at the time of its inception." *Howard v. INA County Mut. Ins. Co.*, 933 S.W.2d 212, 219 (Tex.App.—Dallas 1996, writ denied). When the true intent of the parties cannot be deciphered, reformation of the instrument is inappropriate.[12]

Second, the Underwriters' argument reveals a misapprehension of the nature of the alleged mistake. As the Underwriters concede, it was both parties' intention to include no LSW 507 provision in the Underwriters policy. Thus, the written instrument, which in fact included no LSW 507 provision, was a faithful reflection of

---

**11.** As discussed, English law of mutual mistake is no material way different from Texas law. *See supra.*

**12.** The Court believes the Underwriters misinterpret *Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485 (5th Cir.1992), on this point. The *Enserch* court did not, as the Underwriters urge, do away with *Champlin Oil* 's requirement that the parties' agreement be "definite and explicit." It simply col-

lapsed an unnecessary distinction between "mutual intent" and "actual agreement." *Id.* at 1503–04. The contract in *Enserch* was reformed to include not, in the Underwriters' words, some "concept," but a specific coordinating clause capping recovery for a single claim under two policies, a clause which the trial court found the parties "mutually intended" the policies to contain. *Id.* at 1503.

the parties' agreement. "For the remedy of reformation to be available on the ground of mutual mistake the parties must have reached a definite and explicit agreement, understood in the same sense by both, which agreement has been *misstated* in the written contract because of a mistake common to both contracting parties." *Zurich Ins. Co. v. Bass,* 443 S.W.2d 371, 374 (Tex.Civ.App.—Dallas, 1969, no writ) (emphasis added). In this case, it is admitted that there was no error in expression. *Cf. Goff v. Southmost Sav. & Loan Ass'n,* 758 S.W.2d 822, 826 (Tex.App.—Corpus Christi 1988) (reforming the contract when lending institution's name was typed in the space for the borrower). Rather, the mistake that the Underwriters complain of regards a basic assumption on which the contract was made—*viz.,* that the Beech policy did contain an LSW 507 clause or a fair approximation. Under these circumstances, reformation is not an available remedy. Such mistake, if proven, might entitle the Underwriters to avoid the contract altogether. *See* Restatement (Second) of Contracts § 152; *de Monet v. PERA,* 877 S.W.2d 352, 357 (Tex.App.—Dallas 1994, no writ).[13] But because the Court concludes that another ground for avoidance exists in this case, *see infra,* it does not reach this issue.

## V. MATERIAL MISREPRESENTATION

According to the doctrine of *uberrimae fidei*—"[t]he most abundant good faith; absolute and perfect candor or openness and honesty; the absence of any concealment or deception, however slight," *Black's Law Dictionary* 1520 (6th ed.1990)—"a mistake or commission material to a . . . risk, whether it be willful or accidental, or result from mistake, negligence or voluntary ignorance, avoids the policy." *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.,* 409 F.2d 974, 980 (5th Cir. 1969) (internal quotation marks omitted). The origins of the doctrine may be traced to the English case *Carter v. Boehm,* (1766) 3 Burr.1905, in which Lord Mansfield reasoned:

> First. Insurance is a contract upon speculation.
>
> The special facts, upon which the contingent chance is to be computed, lie most commonly in the knowledge of the insured only: the under-writer trusts to his representation, and proceeds upon confidence that he does not keep back any circumstances in his knowledge, to mislead the under-writer into a belief that the circumstance does not exist, and to induce him to estimate the risque, as if it did not exist.
>
> The keeping back such circumstance is a fraud, and therefore the policy is void. Although the suppression should happen through mistake, without any fraudulent intention; yet still the underwriter is deceived, and the policy is void; because the risque run is really different from the risque understood and intended to be run, at the time of the agreement.

*Id.* at 1909. American courts adopted the English rule, *see e.g., M'Lanahan v. Universal Ins. Co.,* 26 U.S. (1 Pet.) 170, 185, 7 L.Ed. 98 (1828); *Stipcich v. Metropolitan*

---

13. Compare the two following illustrations in the Restatement.

> A and B agree that A will sell and B will buy a tract of land for $100,000 and that B will assume an existing mortgage of $50,-000. In reducing the agreement to writing, B's lawyer erroneously omits the provision for assumption, and neither A nor B notices the omission. At the request of either A or B, the court will reform the writing to add the provision for assumption.

Restatement (Second) of Contracts § 155 illus. 1.

> A contracts to sell and B to buy a debt owed by C to A, and secured by a mortgage. Both A and B believe that there is a building on the mortgaged land so that the value of the mortgaged property exceeds that of the debt, but in fact there is none so that its value is less than half that of the debt. The contract is voidable by B.

Restatement (Second) of Contracts § 152 illus. 4.

*Life Ins. Co.*, 277 U.S. 311, 316, 48 S.Ct. 512, 72 L.Ed. 895 (1928), but, as a general rule, its application in this country has been limited to the context of marine law, and then typically with significant modifications. *See generally* Thomas J. Schoenbaum, *The Duty of Utmost Good Faith in Marine Insurance Law: A Comparative Analysis of American and English Law*, 29 J. Mar. L. & Com. 1 (1998) [hereinafter Schoenbaum]. Not so, however, in England, where *uberrimae fidei* — codified at the Marine Insurance Act, 1906, 6 Edw. 7, ch. 41 [hereinafter British Marine Insurance Act] [14]—continues to be the rule in both marine and nonmarine contexts. *See Pan Atlantic Ins. Co. v. Pine Top Ins. Co.*, [1994] 2 Lloyd's Rep. 427, 455 (H.L.) (Lord Lloyd of Berwick) ("It would have been possible for non-marine insurance to have diverged since the passing of the 1906 act. But it was not suggested that this had happened.").

 Under the English rule, while a showing of an intent to defraud or conceal will obviate the need to demonstrate materiality, "misrepresentation and non-disclosure [are] breach[es] of the duty whether due to fraud, negligence, accident, or mistake." Schoenbaum 15. Which is to say that even "an innocent mistake can give rise to a breach of the duty of utmost good faith." *Id.; accord Thebes Shipping, Inc.*

**14.** The 1906 Act provides:

(1) Subject to the provisions of this section, the assured must disclose to the insurer, before the contract is concluded, every material circumstance which is known to the assured, and the assured is deemed to know every circumstance which, in the ordinary course of business, ought to be known by him. If the assured fails to make such disclosure, the insurer may avoid the contract.
(2) Every circumstance is material which would influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk.

**15.** Fenchurch posits:

Defendants do not contend, and there is no evidence to suggest, that Fenchurch ever made a false assertion about the content of

*v. Assicurazioni Ausonia SPA*, 599 F.Supp. 405, 426 (S.D.N.Y.1984). Knowledge is required, but the requirement is hardly demanding, given that "the assured is deemed to know every circumstance which, in the ordinary course of business, ought to be known by him." British Marine Insurance Act § 18(1).

In the case *sub judice*, Fenchurch plainly made a misrepresentation to the Underwriters when it presented them Endorsement No. 3. Fenchurch indicated that the Beech policy contained the LSW 507 clause, or a clause "based" thereon, when in fact it did not.[15] That Fenchurch made such a representation without knowing the terms of the Beech policy [16] is no explanation. Surely it is true that the reinsured "ought to ... know[ ]" the terms and conditions of its own underlying insurance policy. It is equally true, then, that its agent "ought to ... know[ ]" the same, particularly when that agent offers representations thereof. *See id.* § 19 ("[W]here an insurance is effected for the assured by an agent, the agent must disclose to the insurer (a) [e]very material circumstance which is known to himself, and an agent to insure is deemed to know every circumstance which in the ordinary course of business ought to be known by, or to have been communicated to, him....").

· the original policy. A "misrepresentation" claim must be based on something more than this. At most, Fenchurch's *conduct* created a false *impression* as to the content of the original policy, and there is no legal authority for treating such conduct as a misrepresentation.
Fenchurch's Motion to Dismiss and for Summary Judgment 15. Fenchurch passed to the Underwriters a document that read "Basis of Loss Clause based 507, as original." This was an assertion, and it was not true.

**16.** Q: At the time that you prepared that endorsement, adding the words "as original" to the clause stating "basis of loss clause based LSW 507," did you know that the underlying policy did not contain a clause like that?
A: No.
Deposition of Duncan Bennett 56–57; *see also* Hall Deposition 209.

A misrepresentation such as Fenchurch's, however, does not automatically entitle the insurer to avoid the policy. The misrepresentation must have been "material," and it must have "induced the making of the policy." "Material" is defined by English statute as having the capacity to "influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk." British Marine Insurance Act § 18(2). Construing that statute, and with it, the common law, the House of Lords in *Pan Atlantic Ins. Co. v. Pine Top Ins. Co.* rejected the "decisive influence" test of materiality, articulated by Mr. Justice Lloyd in *Container Transport Int'l, Inc. v. Oceanus Mut. Underwriting Assoc. (Bermuda) Ltd.,* [1982] 2 Lloyd's Rep. 178 (Q.B.), *rev'd,* [1984] 1 Lloyd's Rep. 476 (C.A.):

> In general I would say that underwriters ought only to succeed on a defence of nondisclosure if they can satisfy the Court by evidence or otherwise that a prudent insurer, if he had known the fact in question, would have declined the risk altogether or charged a higher premium.... Since the English law is so favourable to the underwriter in this respect, the least that should normally be expected of the underwriter is to show that a prudent insurer would have charged an increased rate.

*Id.* at 187–88. On appeal, however, the Court of Appeal rejected that interpretation, favoring a more literal construction of "influence," as that word is used in Section 18(2):

> Th[e] duty seems to require full disclosure and full disclosure seems to require disclosure of everything material to the prudent underwriter's estimate of the character and degree of the risk; and how can that be limited to what can affirmatively be found to be a circumstance which would in fact alter a hypothetical insurer's decision?

[1984] 1 Lloyd's Rep. 476, 526–27 (C.A.) (Lord Stephenson). A decade later, in *Pine Top,* the House of Lords agreed with Lord Stephenson: "'Influence the judgment' is not the same as 'change the mind.'" [1994] 2 Lloyd's Rep. at 440 (Lord Mustill). *See generally* Schoenbaum 17–25.

"Inducement" is to be contrasted with the matter of materiality. "[I]t concerns the actual underwriter rather than the imaginary 'reasonable' or 'prudent' underwriter, and it is an inquiry into reliance and the causal connection between the misrepresentation or omission and the effecting of the insurance." *Id.* at 26. In *Pine Top,* the House of Lords unanimously held that such inducement was an implied requirement of the British Marine Insurance Act. *E.g.,* [1994] 2 Lloyd's Rep. at 452 (Lord Mustill).

The LSW 507 clause is a mechanism by which an underwriter is able to exert some control over the adjustment of loss. Clearly its inclusion (or exclusion) in the underlying policy would affect a reasonable and prudent underwriter's assessment of the character and degree of risk; depending upon the policy's adjustment provisions, absence of the clause could translate to much more extensive exposure for the underwriter. Indeed, objective evidence—namely, Colin Baker's insistence upon the inclusion of a loss of basis clause the same as or similar to from the outset—demonstrates that the Underwriters considered the clause an important one. HCC has offered no evidence that, had the misrepresentation not been made, the Underwriters' insistence would have flagged, and the Underwriters have offered testimony indicating just the contrary: "Syndicate 947 has no interest in writing direct or reinsurance with regard to any large fleet of vehicles unless the basis of loss is determined by the language of LSW 507, and Budget Rent–a–Car is a large fleet." Baker Affidavit 2.[17] This uncontradicted

---

17. Stephen Way has testified, "So [the LSW 507 Clause] doesn't seem to have been as

evidence would pass even the "decisive influence" test of materiality, *see supra*, and it sufficiently demonstrates actual inducement. The Court finds, as a matter of law, that Fenchurch's misrepresentation (1) was material and (2) induced the making of the reinsurance policy. *See Giroire*, 27 F.Supp.2d at 1313 (finding misrepresentation to be material as a matter of law when unrebutted testimony of Lloyd's underwriter demonstrated that coverage would have been declined if broker had been truthful). The Underwriters, therefore, are entitled to avoid the reinsurance policy. *See Government Employees Ins. Co. v. Powell*, 160 F.2d 89, 92 (2d Cir.1947) (holding that policy could be avoided because of agent's misrepresentation); *Thebes Shipping*, 599 F.Supp. at 429 (same).[18]

## VI. DECLARATORY JUDGMENT

▮▮▮▮ The Underwriters have asserted a counterclaim against HCC, under the Federal Declaratory Judgment Act (the "DJA"), 28 U.S.C. § 2201 *et seq.*, and the Texas Declaratory Judgment Act, Tex.Civ. Prac. & Rem.Code Ann. § 37.001 *et seq.* (Vernon 1997), seeking declaration that the Underwriters have no obligation to indemnify HCC under the reinsurance policy. Choice-of-law concerns notwithstanding, *see supra*, the Texas statute has been deemed solely a "procedural mechanism" which does not govern a diversity action. *See Utica Lloyd's of Tex. v. Mitchell*, 138

F.3d 208, 210 (5th Cir.1998). The DJA, on the other hand, provides in pertinent part:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201. A district court has broad, but not unfettered, discretion to decide, or dismiss, a suit under the DJA. *See Rowan Cos., Inc. v. Griffin*, 876 F.2d 26, 28–29 (5th Cir.1989). Relevant factors to be considered include (1) whether there is a pending state action in which all of the matters in controversy may be fully litigated, (2) whether the declaratory plaintiff filed suit in anticipation of a lawsuit filed by the opposing party, (3) whether the declaratory plaintiff engaged in forum shopping, (4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist, (5) whether the federal court is a convenient forum for the parties and witnesses, and (6) whether retaining the lawsuit in federal court would serve the purposes of judicial economy. *See Travelers Ins. v. Louisiana Farm Bureau Fed'n*, 996 F.2d 774, 778 (5th Cir.1993). Finding that each of these factors militates in the Underwriters' favor, the declaratory relief sought shall be granted.

important as we're all making out because never did we receive it as part of the policy and never did we receive it amended." Way Deposition 169. That, however, is no evidence of the clause's expendability; Way has ignored the fact that HCC's agent represented to the Underwriters that the clause was already in force in the Beech policy.

18. While the Underwriters clearly seek to avoid the reinsurance policy in their motion for summary judgment, *see* Hanson Affidavit 7–9, they did not explicitly seek such relief in their answer. From the beginning, however, the Underwriters have alleged that a material misrepresentation resulted in the omission of the LSW 507 clause, or a "substantially simi-

lar" clause, from the reinsurance policy—if proven, grounds for avoidance. *See, e.g.,* Second Amended Answer 7. Fed.R.Civ.P. 54(c) provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." *See also In re Hannover Corp. of Am.*, 67 F.3d 70, 75 (5th Cir.1995) ("[A]dherence to a particular legal theory suggested by the pleadings is subordinated to the court's duty to grant the relief to which the prevailing party is entitled, whether it has been demanded or not, provided the failure to demand has not prejudiced the adversary.").

The Underwriters also seek attorney's fees and related non-taxable costs under the DJA, which provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted ... against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202.[19] Under the well-established American Rule followed by federal courts, "absent statute or enforceable contract, litigants pay their own attorneys' fees." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The DJA "does not by itself provide statutory authority to award attorney's fees that would not otherwise be available under state law in a diversity action." *Mercantile Nat'l Bank v. Bradford Trust Co.*, 850 F.2d 215, 218 (5th Cir.1988). Furthermore, the "otherwise ... available" law must be substantive, *see Utica*, 138 F.3d at 210, and as discussed, the Texas Declaratory Judgment Act is not itself such a substantive provision. *See id.* Because the Underwriters have failed to point to any substantive law authorizing the award of attorney's fees, the Court concludes that their request must be denied.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Dkt.# 34) is DENIED and Defendants' Motion for Summary Judgment (Dkt.# 32) is GRANTED. In light of this disposition, Third Party Defendant's Motion to Dismiss and for Summary Judgment (Dkt.# 31) is DISMISSED AS MOOT. FINAL JUDGMENT shall issue.

It is so ORDERED. The Clerk shall enter this order and provide a true copy to both parties.

---

19. The Underwriters specifically pled attorney's fees in their Second Amended Answer, thereby satisfying any requirement under Fed.

R.Civ.P. 9(g). *See United Indus., Inc. v. Simon–Hartley, Ltd.*, 91 F.3d 762, 764–65 (5th Cir.1996).